GERTRUDE M. HIGHLAND *et al.* v. EMPIRE NATIONAL BANK OF CLARKSBURG, *a corporation, et al.*

(No. 7698)

Submitted November 9, 1933.   Decided December 21, 1933.

*E. A. Bowers, S. A. Powell* and *L. A. Henderson,* for plaintiffs in error.

*Steptoe & Johnson, Stanley C. Morris* and *James M. Guiher,* for defendants in error.

LITZ, JUDGE:

This proceeding, originating in the county court of Harrison County, was instituted September 26, 1932, by Gertrude M. Highland, widow, and Stephen Lee Highland, Anita High-

land Simmons, Linda Marion Highland and Florence Jean Highland, children of Virgil L. Highland, deceased, and Cecil B. Highland, petitioners, against the Empire National Bank and Melvin G. Sperry, as coexecutors and cotrustees with Cecil B. Highland under the will of Virgil L. Highland, for the removal of Sperry and the bank as executors and trustees. In their answer to the petition for their removal, Sperry and the bank also prayed for the removal of Cecil B. Highland as executor and trustee. The county court, after considering a mass of testimony taken in open court in sessions lasting approximately. two weeks, entered an order removing the three executors and trustees. Upon writs of error to the judgment of the county court, the circuit court of Harrison County, presided over by the judge of another circuit (the regular judge, the Honorable Birk S. Stathers, being disqualified), reinstated each of them. Thereafter, Cecil B. Highland obtained a writ of error from this court to the order of the circuit court in reinstating the bank and Sperry.

Virgil L. Highland, a prominent and highly respected business man of Clarksburg, died, testate, August 9, 1930. He was largely interested in numerous business ventures including the Empire National Bank of Clarksburg (with a capital stock of $250,000.00 divided into 2500 shares of the par value of $100.00 each) and the Clarksburg Telegram Company, a corporation, which formerly published in Clarksburg the Clarksburg Telegram, a daily Republican newspaper. As a substantial stockholder, director, and president of the bank, he directed its affairs and policies from its organization in 1904 to the time of his death. Likewise, as practical owner thereof, he also directed and controlled the affairs and policies of the newspaper company from its beginning in 1901, during the remainder of his life. In 1927, he and J. Hornor Davis, who owned the controlling interest in The Exponent Company, a corporation, publishing a daily Democratic newspaper in Clarksburg, organized the Clarksburg Publishing Company, a corporation, for the purpose of publishing the two papers, by merging the Telegram and Exponent companies. The stock in the new corporation was divided into 3,000 common shares and 2,000 preferred. Eighteen hundred shares of the common stock, designated as Class A stock, and repre-

senting the interest of the stockholders in the Clarksburg Telegram Company, were issued to Virgil L. Highland, as trustee under a voting trust agreement between himself and J. Hornor Davis, trustees, Clarksburg Telegram Company and The Exponent Company, and the remaining 1200 shares of common stock, designated as Class B stock, and representing the interest of the stockholders in The Exponent Company, were issued to J. Hornor Davis, as trustee under the agreement.

By his last will and testament, dated March 20, 1917, following the designation of certain bequests, he gave, devised and bequeathed unto the Empire National Bank, as executor and trustee, all of the rest and residue of his estate and property, of whatever kind or nature, and wherever situated, "in trust to hold, manage and control the same, and every part thereof, collecting the rents, incomes, dividends and profits arising therefrom, and paying out of said rents, incomes, dividends and profits all proper taxes, assessments, charges and expenses incident to the management thereof, including such fire insurance as may be deemed reasonable." The will proceeds: "I hereby authorize and direct my said executor and trustee to carry on any business or financial affairs in which I may be interested, individually, or with others, at the time of my death, as fully, and to the same extent, as I could or might do if still living; and to so handle and manage my estate as not to unnecessarily jeopardize the interests of any person or persons with whom I may be associated in any business undertaking at the time of my death, and to that end my said executor and trustee, and its successors in office, are hereby authorized to make, sign, accept, or endorse notes, bonds, acceptances or commercial paper of any character or description, which may be required to carry on such business, or renew paper which I am on, individually or jointly, with others, for debts which I owe, or for which I am surety, and such bonds, notes, or commercial paper shall bind and be obligatory on my estate with the like effect, in all respects, as if I, in my lifetime, had made, signed, accepted, or endorsed the same; and my said executor and trustee, and its successors in office, shall have charge of, and control and manage the said trust estate, with

the right and authority to sell or dispose of the same, both real and personal, or any part thereof, at private or public sale; to change, from time to time, the form or character of any of the investments thereof; to invest the same from time to time in mortgages on real estate, or any such other safe, interest bearing securities as to them shall seem best; with full power, at all times, and from time to time, to alter, change and vary the investments thereof, whether existing at the time of my death, or made thereafter: Provided, that they shall not sell or dispose of my shares of the capital stock of the Clarksburg Telegram Company, and that they shall not sell or dispose of any other property, real or personal, of which I may die seized, unless they are satisfied that such sale or disposition will be for the benefit of my estate, and for the best interests of those entitled thereto.''

The executor and trustee was also authorized and directed to pay, out of the rents, dividends, and profits of the estate, monthly to the widow, during the continuance of the ''trust'', the sum of $1,000.00 for the support and maintenance of herself and testator's children, and such additional sums as might be necessary to keep the children in school and to give to each of them a thorough college education; and, in event of her death before the termination of the trust, to apply the allowance for her, or as much thereof as might be necessary, to the support, maintenance and education of the children. The will further authorized and directed the executor and trustee, in event of an insufficiency of income for the purpose, to sell, from time to time, such of the real and personal property of the estate as might be necessary to meet the payments to the widow; and to distribute the interest of each child under the will as he or she became twenty-five years of age. It also directs the executor and trustee to devote and apply the proceeds from any and all insurance on the life of the testator, first, to the discharge of his individual indebtedness, second, to the discharge of any other debts for which he may be bound as surety, and third, to the payment of specific bequests, ''so as to best protect and preserve'' the estate. The will contains many other provisions, confirming the intention of the testator to confer upon the executor and

trustee complete, discretionary powers to manage, control and dispose of the estate.

By codicil, dated July 5, 1927, the proviso in the will, against the sale or disposition of the shares of capital stock of the Clarksburg Telegram Company, is cancelled, leaving to the executor and trustee "the same discretion in the matter of the sale of such shares of stock" as had been "reposed in it with respect to any other property of which" the testator may die seized; and changes the age at which the children shall receive their bounties under the will from twenty-five to thirty-five. The codicil further provides: "It is contemplated that my executor will, within a reasonable time after my death, close and settle its account as such, and will continue to control and conserve my estate thereafter as trustee, and in all references to my 'executor' and 'trustee', contained in my will, I direct and intend that the expression shall be taken in the disjunctive as well as in the conjunctive form, and that from and after the settling and closing of my accounts by my executor as such, that all powers in my will conferred shall be thereafter exercised by my said trustee."

By a codicil, dated July 15, 1927, the testator requested that the executor make ample provision for the comfort and necessary wants of his four children pending the distribution of the estate. On August 8, 1930, the day before his death, the testator appended to his will another codicil, as follows: "I want Cecil B. Highland and M. G. Sperry to act with the Empire National Bank as joint executors and trustees of my estate should anything happen to me. They know about my business affairs and can handle them in conjunction with E. B. Deison, who I would like to see made President of the Bank in case I do not survive."

The powers thus conferred being in the nature of a trust, as we have held in the companion case similarly styled (172 S. E. 544), must be exercised jointly. 11 R. C. L. 491.

On August 20, 1930, Deison, who had been serving as active vice-president, was appointed president of the bank, and Cecil B. Highland was selected to the position vacated by Deison at an annual salary of $4,500.00, later increased to $7,500.00. Sperry, Highland and the bank qualified as executors and trustees the following day.

The assets of the estate valued at $973,185.62, in the report

of the appraisers completed June 4, 1931, consisted of corporate stock of the value of $573,375.00, cash in the bank $6,229.36, accounts and bills receivable $2,044.63, tangible personal property $3,080.00 and life insurance of $274,830.83. The corporate stock included 472 shares of the capital stock of the Empire National Bank, valued at $141,600.00, 1656 common shares in the Clarksburg Publishing Company valued at $165,600.00, 480 preferred shares in the Clarksburg Publishing Company valued at $48,000.00, 2556 shares of the capital stock of National Steel Company valued at $127,000.00, and 700 shares of the capital stock of Chrysler Corporation valued at $14,000.00. The real estate was appraised at $113,625.00. The debts amounted to about $700,000.00. The proceeds of the insurance and the income from the estate have been applied to the payment of debts, the monthly allowances to the widow and $1,900.00 on bequests to members of the family.

Soon after qualifying as executors and trustees of the estate, Sperry and Cecil B. Highland each sought the appointment, to succeed Virgil L. Highland, as trustee under the voting trust agreement which conferred upon Virgil L. Highland and J. Hornor Davis, and their successors in office, the management and control of the Clarksburg Publishing Company. Sperry says that Cecil assured him before Cecil was appointed to the vice-presidency of the bank that Sperry would receive the appointment. According to testimony of several officers of the publishing company, Cecil endeavored to have himself appointed at two meetings of the board of directors. In June, 1931, the executors executed and filed with the state tax commissioner and the Internal Revenue Department estate tax returns in which it was stated that the expenses of administration consisted of estimated commissions to the fiduciaries of $20,000.00 and estimated fees to attorneys of $20,000.00. The Government having refused a reduction for costs of administration upon an estimated basis, Sperry and Deison executed a protest, and supporting affidavit, more definitely committing the estate to these charges, which papers, after Cecil had refused to sign them, were mailed to the Revenue Department by Sperry. Cecil, upon being informed that the documents had been filed, secured

photostatic copies thereof, and criticized Sperry and Deison for executing the papers by charging that they were seeking to take advantage of the estate.

At a meeting of the board of directors of the bank, March 9, 1932, at which Sperry presided, Cecil was removed as vice-president. This was done, according to testimony of the bank officials, to comply with a request of the Comptroller of the Currency to reduce expenditures. No payments have been made to Mrs. Highland since March 1, 1932, although checks for April and May of that year were signed by Cecil and Deison. Sperry states, as the sole reason for refusing to sign these checks, that the estate is clearly insolvent. Cecil insists that it is solvent, and, if properly managed, will pay the beneficiaries several hundred thousand dollars. Divergent views of Sperry and Cecil concerning the solvency of the estate and the manner of administration have resulted in serious disagreement affecting their fiduciary relations. They have not been in accord as to the advisability of selling the publishing company and bank stock. Sperry expresses the opinion in his testimony that the publishing company stock, which he now considers to be of little value, could have been sold to Hugh Ike Shott and sons, of Bluefield, for $500,000.00 if Cecil had not opposed the sale. Cecil says that the negotiations came to naught because of the inability of the Shotts to raise the purchase price. He and Sperry have disagreed to the extent of litigation upon the appointment of a trustee, under the voting trust agreement, to fill the vacancy caused by the death of the testator, and apparently have not co-operated in matters concerning the estate since December, 1931.

As the powers conferred upon the executors and trustees, under the will, must be exercised jointly, and since the disagreements between Sperry and Cecil have prevented joint action by the three executors and trustees in the administration of the estate, we would not be justified in disapproving their removal. The county court being invested with peculiar jurisdiction of trust estates and fiduciary matters, its action in removing trustees, while subject to review, should not be reversed in the absence of an abuse of discretion. "What constitutes a sufficient reason for removing a trustee is a matter

peculiarly within the discretion of the court, which should be guided by consideration of the welfare of the beneficiaries and of the trust estate." 28 Am. & Eng. Cyc. of Law 978. *Lamp* v. *Homestead Building Association,* 62 W. Va. 56, 57 S..E. 249.

Disagreement among trustees, preventing effective action by them in the administration of the trust, is cause for their removal. "The doctrine seems to have been carried so far by the courts as to remove a joint trustee from a trust who wished to continue in it, without any direct or positive proof of his personal default, upon the mere ground that the other cotrustees would not act with him; for in a case where a trust is to be executed, *if the parties have become so hostile to each other that they will not act together,* the very danger to the due execution of the trust and the due disposition of the trust fund requires such an interposition to prevent irreparable mischief." 2 Story Eq. Juris. (13th Ed.) 631. "It may be stated generally, that if the conduct or circumstances of the trustees are such as to render it very inconvenient, improper, or inexpedient for them to continue in the trust, the court will exercise its discretion and relieve them, and appoint others in their place; as where the trustees * * * so disagreed among themselves that they could not act." 1 Perry on Trusts & Trustees (17th Ed.) 491. "Where the trustee occupies antagonistic relations to the trust property because of his personal interest therein, or where inharmonious or unfriendly relations exist between the trustees, or between them and the *cestui que trust,* there may be sufficient reason for removal." 39 Cyc. 263. "The power of a court of equity to remove a trustee, and to substitute another in his place, is incidental to its paramount duty to see that trusts are properly executed; and may properly be exercised whenever such a state of mutual ill-feeling, growing out of his behavior, exists between the trustees, or between the trustee in question and the bene-ficiaries, that his continuance in office would be detrimental to the execution of the trust, even if for no other reason than that human infirmity would prevent the cotrustee or the beneficiaries from working in harmony with him, and although charges of misconduct against him are either not made out, or are greatly exaggerated. *Uvedale* v. *Ettrick,* 2 Ch. Cas.

130; *Letterstedt* v. *Broers,* 9 App. Cas. 371, 386; *McPherson* v. *Cox,* 96 U. S. 404, 419; *Scott* v. *Rand,* 118 Mass. 215, 218; *Wilson* v. *Wilson,* 145 Mass. 490, 14 N. E. 521; 2 Story Eq. Juris. sec. 1288." *May* v. *May,* 167 U. S. 310. "It remains to consider whether the power of removal has been judiciously exercised. It plainly appears that the relation sustained between this trustee and the other two are so unfriendly and hostile as to endanger the execution of the trust. They can neither consult in harmony, nor act in concert in relation to the estate, and it seems to be agreed that their differences are irreconcilable. These facts are sufficient to themselves to justify the removal of a trustee, without inquiry respecting the outgrowth of hostility." *Deraismes* v. *Dunham,* 22 Hun. (N. Y.) 86. "There is no doubt that the supreme court has the power to remove, when a sufficient cause exists, trustees from the management of trust estates, and the exercise of this power does not necessarily depend upon proof of actual mismanagement, misconduct or dishonesty of the trustees. Whenever the court can see that inharmonious or unfriendly relations exist between the trustees, or between them and the *cestui que trust,* and that by reason of such inharmonious and unfriendly relations material injury may and is likely to result to the trust estate, it will exercise the power which it has, and to prevent that injury it will remove one, or, if the interest of the estate requires it, all of the trustees." *Disbrow* v. *Disbrow,* 46 Hun. (N. Y.) 111. "The removal of a trustee (under a will) is proper, where the relations between him and his cotrustee are such that they will not probably cooperate in carrying out the trusts beneficially to those interested, and a majority of the beneficiaries ask for such removal. And it is not essential how such relations originated, or whether the trustee, whose removal is sought, caused them by his own misconduct or not." *Quackenboss* v. *Southwick,* 2 Hand (N. Y.) 117.

The order of the circuit court is, therefore, reversed.

*Reversed.*