**HELVERING, Com'r of Internal Revenue, v. HIGHLAND.**

No. 4863.

Circuit Court of Appeals, Fourth Circuit.

Jan. 5, 1942.

---

Sherley Ewing, Sp. Asst. to Atty. Gen., (Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch, Sp. Asst. to Atty. Gen., on the brief), for petitioner.

Lawrence R. Lynch, of Clarksburg, W. Va., for respondent.

Before SOPER and DOBIE, Circuit Judges, and COLEMAN, District Judge.

DOBIE, Circuit Judge.

This is an appeal from a decision of the United States Board of Tax Appeals (hereinafter called the Board). The Board's decision was that there was no deficiency in the income taxes of the estate of which the respondent is executor for the year 1935 and that there was a deficiency of $1,533.59 for the year 1936. The Commissioner of Internal Revenue (hereinafter called the Petitioner) asserts that there are deficiencies for the years 1935 and 1936 in the amounts of $63.36 and $4,312.71, respectively.

The question presented for decision is whether certain attorney's fees, miscellaneous legal expenses and office expenses are to be treated as expenses of administration and consequently deductible only under the estate tax or whether they are to be treated as ordinary and necessary expenses incurred in carrying on the estate as a business and consequently deductible from gross income of the estate under Section 23(a) of the Revenue Acts of 1934 and 1936, 26 U.S.C.A. Int.Rev.Code, § 23(a).

The essential facts are not in dispute and are fully set forth in the findings of the Board. We adopt as fair and accurate the statement found in the Petitioner's brief:

"Decedent died in August, 1930, leaving a will naming as executors and testamentary trustees, the Empire National Bank of Clarksburg, West Virginia, Melvin G. Sperry and the respondent. The property of the estate consisted principally of fairly large real estate holdings, securities and life insurance. The will provided that the residue of the estate should be held in trust with a provision for support of the widow and children. The trust is to continue until January, 1951. The will authorized the executors and trustees to carry on any business or financial affairs in which the decedent might be interested at the time of his death 'as fully and to the same extent as I could or might do if still living'. The will gave the trustees rather broad discretionary powers.

"Shortly after the executors were appointed, disagreements developed between the respondent and the other two. A suit was instituted by the respondent, as executor, together with the widow and children, for the removal of the two other executors, who were removed in December, 1933. Since that time the respondent has acted as sole executor and testamentary trustee.

"The estate included the capital stock of several land companies and a majority of the class 'A' common stock of the Clarksburg Publishing Company which publishes three papers. The class 'A' stock has equal representation on the board of directors of the publishing company with the class 'B' stock, which is owned by other interests. The 'A' stock is representative of the Clarksburg Telegram and the 'B' stock represents the Clarksburg Exponent.

"Respondent has been president of the Clarksburg Publishing Company since June, 1934, a director since January or February, 1934, and in addition has directed the policies of the Clarksburg Telegram since he became sole executor and testamentary trustee of the estate in January, 1934. As president he has about one hundred and sixty-two employees of the company under his general supervision and direction, including the editorial force and all departments. Respondent devotes substantially all of his time to the management of the real estate items of the estate, supervising the Clarksburg Publishing Company, and directing the affairs and policies of the Clarksburg Telegram. He arrives at the plant by 6:30 or 6:45 each morning, examining every editorial, visiting the plant two or three times a day, conferring with the editor, and keeping in touch with the paper's affairs at all times throughout the day. Decedent for many years had directed the policies of the Clarksburg Telegram and was president of the Clarksburg Publishing Company from its organization in 1927 until his death.

"The Clarksburg Publishing Company did a gross business of $531,390.25 in 1935 and $603,804.97 in 1936. The estate received as dividends from the Clarksburg Publishing Company $11,051.58 in 1935 and $54,000 in 1936 which constituted a sub-

stantial part of the total income of the estate.

"In addition, the estate owns 472 shares out of a total of 2,500 shares of common stock of the Empire National Bank of Clarksburg. It was organized in 1903 by the decedent, who was its president from 1903 until his death. With the exception of the year 1933, respondent has been a director of that bank since 1903.

"In 1935 and 1936 the estate paid attorneys' fees in the respective amounts of $3,522 and $7,068.03 in connection with the following four lawsuits:

"1. To restrain Melvin G. Sperry and the Empire National Bank from voting class 'A' common stock of the Clarksburg Publishing Company owned by the estate, Sperry having been appointed by the Bank voting trustee of this stock. ('Voting Trust suit'.)

"2. To remove the Empire National Bank and Melvin G. Sperry as executors of the estate. ('removal suit'.)

"3. To resist creditors' suits instituted for the immediate liquidation of the estate. ('liquidation suit'.)

"4. To resist actions at law against certain land companies, in all but one of which the estate owned all the stock. In the one company the estate owned nearly 50 percent of the stock. ('Land Companies suit'.)

" '*Voting Trust suit*'.—The first of these suits was for the purpose of appointing a voting trustee for the 1,800 shares of class 'A' common stock of the Clarksburg Publishing Company, of which the estate owned 1,656 shares. After decedent's death the three coexecutors disagreed as to who should be named voting trustee and as a result there was no trustee representing this stock from 1930 to 1932, and no directors or officers were elected. Decedent's heirs and all owners of class 'A' stock petitioned to have respondent appointed trustee. While this suit was pending, Sperry and the president of the Empire National Bank, Sperry and the bank being coexecutors, appointed Sperry voting trustee. Respondent then obtained an injunction restraining Sperry from acting, and eventually another trustee friendly to the respondent's interests was appointed and confirmed by the State Supreme Court of Appeals in Highland v. Empire Bank, 114 W. Va. 473, 172 S.E. 544.

" '*Removal suit*.'—The second suit, similarly styled, and nearly contemporaneous with the first, was to remove Sperry and the bank as coexecutors. Respondent had objected to an attempted sale by one of his coexecutors of the Clarksburg Publishing Company stock to an outsider. The bank's president was so involved with Sperry in business matters that these two executors acted together, and against respondent. Respondent's two coexecutors were removed in this suit, which also reached the State Supreme Court of Appeals, Highland v. Empire Bank, 114 W.Va. 498, 172 S.E. 551.

" '*Liquidation suit*'.—During the pendency of the 'Removal suit', the two coexecutors had advertised for sale on September 23, 1933, at the court house door nearly all the assets of the estate, including the Clarksburg Publishing Company stock and the Empire National Bank stock. Respondent sought and obtained an injunction pending the outcome of the 'Removal suit.' At that time the general economic depression had affected the values of all stocks.

" '*Land Companies suit*'.—At the same time the coexecutors had obtained consent of certain creditors of decedent's wholly owned or controlled land companies to bring creditors' suits in their names in the West Virginia county courts against the real estate companies, and defense of these suits became necessary. Respondent retained counsel and paid counsels' fees.

"In addition respondent paid $1,000 and $105 in 1935 and $4,750 in 1936 as attorneys' fees and advanced attorneys' expenses in a suit against J. Horner Davis in which the respondent sought to set aside a purported sale in February 1935, of 568 shares of the class 'A' common stock of the Clarksburg Publishing Company pledged by the decedent to secure a note which was renewed by his executors in the principal amount of $45,000 and to redeem the pledged stock of the estate. Davis, the voting trustee of class 'B' stock of the Clarksburg Publishing Company, had bought the note for its principal amount plus interest then accrued, $45,360, and met with the board of directors of the Exponent Company, which voted to take over the stock pledged for this note. Respondent, until then unaware of the sale, instituted suit to redeem the stock, alleging that the stock had a much higher market value. Ownership of this stock will determine ownership of the Clarksburg Publishing Company after the trust agreement determines. [sic] The county court grant-

ed respondent's petition for an injunction against 'the stock transfer and impounded the stock dividends. The suit was pending at the time of the hearing in this proceeding.

"Also attorneys' fees in the amount of $300 for 1935 and $303.75 for 1936 were paid by the estate in a suit by E. A. Bowers against respondent, in which suit respondent resisted Bowers' claim for attorneys' fees for legal services in connection with the 'Removal' and 'Voting Trust' suits.

"In 1936 respondent paid $251.25 as attorneys' fees in settling the claim of Lillie Denham against the estate. Her claim against the estate, based on improper acts of decedent as executor of her husband's estate, was for about $17,000 and was compromised for about $10,000.

"In 1935 the estate also paid $1,160.79 as miscellaneous expenses in the 'Removal' and 'Voting Trust' cases ($674.74) and the Davis case ($486.05), and in 1936, $203.50 as expenses in the latter suit.

"The respondent in 1935 paid $776.10 and in 1936 $849.62 as office expenses, amounting to two-thirds of respondent's total office expenses, which he allocated to estate 'management expenses'.

"The estate reimbursed respondent in 1936 for $117.13 of expenses incurred in administering the estate.

"In the federal estate tax return there was deducted as administration expenses $20,000 for executors' commissions, $20,000 for attorneys', fees and $1,219 for miscellaneous expenses. During 1935 and 1936 the estate was still in the process of administration.

"The respondent claims a deduction for all of the fees and expenses mentioned above from the gross income of the estate in determining its income tax liability. The Commissioner disallowed them all. The Board upheld the disallowance of the fees (1935—$1,000; 1936—$4,750) and expenses (1935—$486.05; 1936—$203.50) involved in the Davis suit, the fees (1936—$251.25) in the Denham suit, and the reimbursement (1936—$117.13) made to respondent for miscellaneous expenses. Since the taxpayer has not taken an appeal, the disallowed deductions are not in issue."

The Petitioner is appealing from the Board's decision allowing the other amounts as deductions for business expenses, claiming that they are properly expenses of administering the estate and therefore capital in nature.

Section 23(a) of the Revenue Act of 1934, c. 277, 48 Stat. 680, is the same provision as that appearing in Section 23(a) of the Revenue Acts of 1939, 1938, 1936, 1934, 1932 and 1928, 26 U.S.C.A. Int.Rev. Code, § 23(a), and in Section 214(a) of the Revenue Acts of 1926, 1924, 26 U.S.C.A. Int.Rev.Code, § 23(a) and 1921, and 1919, 42 Stat. 254, 40 Stat. 1077. See Paul and Mertens, Federal Income Taxation (1934) § 23.01. It provides:

"In computing net income there shall be allowed as deductions:

"(a) *Expenses. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business,* including a reasonable allowance for salaries or other compensation for personal services actually rendered; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity." (Italics supplied.)

Thus, it will be noticed that in order to spell out an allowable deduction under the statute three elements must concur: (1) the expenditure must have been incurred in carrying on any trade or business; (2) it must have been an ordinary expenditure in such connection; and (3) it must have been a necessary expenditure in such connection. See Holmes, Federal Income Tax (6th ed. 1925) § 481; Klein, Federal Income Taxation (1929) 394.

Section 162 of the Revenue Act of 1934, c. 277, 48 Stat. 680 and the Revenue Act of 1936, c. 690, 49 Stat. 1648, 26 U.S.C.A. Int. Rev.Code, § 162, provides: "The net income of the estate or trust shall be computed in the same manner and on the same basis as in the case of an individual, * * *."

Obviously then, the same criteria are used for an estate's activities as for an individual's activities in determining whether a deduction is to be allowed. Cf. City Bank Co. v. Helvering, 313 U.S. 121, 61 S.Ct. 896, 85 L.Ed. 1227; United States v. Pyne, 313 U.S. 127, 61 S.Ct. 893, 85 L.Ed. 1231. Just as an individual not

in business cannot deduct attorneys' fees and miscellaneous legal expenses, so an executor cannot deduct like fees when they are actually liquidation and administration expenses. Cf. Hartley v. Com'r, 8 Cir., 72 F.2d 352.

■■ Recently, the Supreme Court had occasion to observe that no Treasury Decision has ever defined or interpreted "carrying on a business". See Higgins v. Commissioner, 312 U.S. 212, 61 S.Ct. 475, 477, 85 L.Ed. 783. Certainly, lack of uniformity in prior court decisions and instability in adminstrative practice preclude any presumption of Congressional approval of judicial interpretations or administrative practices by reenactment. Cf. Helvering v. Winmill, 305 U.S. 79, 83, 59 S.Ct. 45, 83 L.Ed. 52. "Business" as first defined by the Supreme Court was said to embrace "everything about which a person can be employed" and "which occupies the time, attention, and labor of men for the purpose of a livelihood or profit". See Flint v. Stone Tracy Co., 220 U.S. 107, 171, 31 S.Ct. 342, 357, 55 L.Ed. 389, quoted with approval in Von Baumbach v. Sargent Land Co., 242 U.S. 503–515, 37 S.Ct. 201, 61 L.Ed. 460. More recently the term has been re-defined by that Court and narrowed so that "carrying on any trade or business" is now said to mean "holding one's self out to others as engaged in the selling of goods or services". See Deputy v. Du Pont, 308 U.S. 488, 499, 60 S.Ct. 363, 369, 84 L.Ed. 416, quoted with approval in Helvering v. Wilmington Trust Co., 3 Cir., 124 F.2d 156; cf. Higgins v. Commissioner, 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783. This interpretation means substantially that the deduction of expenses can be had only as against the business in which the individual is engaged. No case of private investment management can as a matter of law constitute a business. But see H. R. 6175 (Bill introduced Dec. 4, 1941 by Congressman Disney, proposing a change in the existing law on this matter).

■ ■ Even under this new spun definition of "business", however, certain factors remain of lasting evidentiary importance. For instance, the profit motive and presence of business-like policies should be given great weight. E. g., Cecil v. Commissioner, 4 Cir., 100 F.2d 896; Whitney v. Commissioner, 3 Cir., 73 F.2d 589; Commissioner v. Field, 2 Cir., 67 F.2d 876; Doggett v. Burnet, 62 App.D.C. 103, 65 F.2d 191; Plant v. Walsh, D.C., 280 F. 722; cf. Chaloner v. Helvering, 63 App.D.C. 85, 69 F.2d 571; Union Trust Co. v. Commissioner, 6 Cir., 54 F.2d 199; Deering v. Blair, 57 App.D.C. 367, 23 F.2d 975; Thacher v. Lowe, D.C., 288 F. 994; see Deputy v. Du Pont, 308 U.S. 488, 500, 60 S.Ct. 363, 84 L.Ed. 416. ·Similarly, the fact that a separate office is maintained is of evidentiary importance to suggest that the taxpayer is engaged in business. See Foss v. Commissioner, 1 Cir., 75 F.2d 326, 328; cf. Washburn v. Commissioner, 8 Cir., 51 F.2d 949. Likewise, the length of time required for an executor's dealings is an important factor in distinguishing purely administrative expenditures from expenses incurred in carrying on the estate as a business. See George W. Oldham v. Com'r, 36 B.T.A. 523, 530; Appeal of Seymour H. Knox, 3 B.T.A. 143, 146; cf. William W. Mead v. Com'r, 6 B.T.A. 752. In the case of George W. Oldham v. Com'r, supra, a curator of a decedent's estate was appointed to conserve the estate during the period of a will contest. The Board, although denying the deduction, said (at page 530 of 36 B.T.A.): "The test most frequently used to distinguish between the two types of expenses is whether the estate has been or is required to be kept intact beyond the period usually necessary for administration. * * * In cases where, according to the provisions of the will or testamentary trust, it is necessary to continue the estate intact over a period of years, and to carry on its affairs as a business in the interim, the fees and commissions paid to representatives of the estate for such services constitute expenses, deductible for income tax purposes."

■ True it is that the duty of an executor or administrator is primarily to liquidate the affairs of the decedent. Yet there are many cases where the executor or administrator may be engaged in carrying on a trade or business. The Supreme Court, subsequent to the formulation of its new definition of "business", expressly recognized the truth of this: "Executors who engage actively in trade and business are the·exception and not the rule. Rather obviously, there could be clear cases where executors 'carry on * * * business' by continuing to operate a store, a factory or some other well known, well marked type of business activity. But in the absence of evidence showing activities coming within the general acceptation of the concept of carrying on a trade or business, it

cannot be said as a matter of law that an executor comes into this category merely because he conserves the estate by marshalling and gathering the assets as a mere conduit for ultimate distribution." United States v. Pyne, 313 U.S. 127, 61 S.Ct. 893, 895, 85 L.Ed. 1231.

As we have already indicated, even after it has been determined that the taxpayer is engaged in carrying on a business, a further condition to the allowance of the deduction is that the particular expenses involved be "ordinary and necessary". The words "ordinary and necessary" of course are used in the conjunctive and not in the disjunctive. See Deputy v. Du Pont, 308 U.S. 488, 497, 60 S.Ct. 363, 84 L.Ed. 416. Each case must of necessity be decided on its own particular facts and very many factors, including the nature and condition of the business, will be injected into the ultimate determination. See Klein, Federal Income Taxation (1929) 325.

It has been said that "ordinary" means normal, usual or customary; see Deputy v. Du Pont, 308 U.S. 488, 495, 60 S.Ct. 363, 84 L.Ed. 416, and that "necessary" means appropriate and helpful. See Blackmer v. Commissioner, 2 Cir., 70 F.2d 255, 256, 92 A.L.R. 982. Regardless of the merits of these definitions, it is clear that an expense, to be deductible, must proximately result from the carrying on of the particular trade or business involved and "must have some reasonable relation to the business in question". See Crowley v. Commissioner, 6 Cir., 89 F.2d 715, 717, 718; cf. Deputy v. Du Pont, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416; Kornhauser v. United States, 276 U.S. 145, 48 S.Ct. 219, 72 L.Ed. 505; Foss v. Commissioner, 1 Cir., 75 F.2d 326.

In the light of these general principles, we now come to a consideration of the particular deductions claimed here. At the outset, it should be noticed that the will of the decedent both authorized and directed his executor and trustee to carry on the estate and its properties as a business from the date of decedent's death in 1930 until January 19, 1951. This we consider a highly significant factor. We agree with the Supreme Court of Appeals of West Virginia that the powers and duties conferred in the instant case upon the executors "far transcended the ordinary powers required in the administration of an estate". Highland v. Empire National Bank of Clarksburg, 114 W.Va. 473, 172 S.E. 544, 548. Clearly, the taxpayer was not in the role of a passive investor, a mere conservator of property, or a normal liquidator of an estate. Cf. United States v. Pyne, 313 U.S. 127, 61 S.Ct. 893, 85 L.Ed. 1231; Higgins v. Commissioner, 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783; see Kales v. Commissioner, 6 Cir., 101 F. 2d 35, 122 A.L.R. 211.

Rather we believe that the estate by virtue of its holdings in several real estate companies was actively engaged in the real estate business and even more actively in the newspaper business. All the evidentiary factors which we have previously mentioned in this opinion point to such a conclusion.

We agree with the Board that the suits involved in this case were connected with the carrying on of the business of the estate and not with its mere conservation or liquidation. The questions involved in the suits were the management of the estate's assets as a business. It would seem to follow, under the principles previously set out in this opinion, that the attorney's fees and other miscellaneous expenses incurred in those suits were incurred in carrying on a business and are, therefore, deductible from gross income. The nature and details of these suits are set out in the statement of facts at the beginning of our opinion, and also in the opinion of the Board. We think it would serve no useful purpose for us to review and further discuss these facts and details.

Petitioner cited in his brief and relied on Dalton v. Bowers, 287 U.S. 404, 53 S.Ct. 205, 77 L.Ed. 389, and Burnet v. Clark, 287 U.S. 410, 53 S.Ct. 207, 77 L.Ed. 397. These cases are not in point. In Dalton v. Bowers, a taxpayer-inventor formed a corporation to market his inventions, taking stock in return for his cash contribution. In disallowing eventual loss on the stock as not incurred in the taxpayer's business, the Court rejected the argument that the corporation was merely a part of the taxpayer's business of marketing his inventions. In Burnet v. Clark, a majority stockholder and president of a corporation incurred a loss through endorsing its notes. In disallowing the loss, the Court again emphasized the fact that the taxpayer was not regularly engaged in the business of endorsing notes.

Finally, petitioner intimated in his brief and on oral argument that, because the expenses involved here had already been deducted under the estate tax law, these same expenses were precluded from being deducted under the income tax statute. This is not the law. See Robert J. Kleberg v. Com'r, 31 B.T.A. 95. In the Kleberg case, the Board said (at page 100 of 31 B.T.A.):

"If an item is properly deductible under some provision of the estate tax law in determining the net estate subject to the tax, and the same item is also deductible under a provision of the income tax law in determining the net income of the estate subject to income tax, that fact does not militate against the allowance in either levy."

For the foregoing reasons we conclude that the decision of the Board of Tax Appeals was correct and should be affirmed.

Affirmed.