# CHARLESTOWN.

### HINKLE *v.* HINKLE.

Submitted September 4, 1890.—Decided September. 13, 1890.

1. CONTRACT—ANTENUPTIAL CONTRACT—DOWER.

An antenuptial contract, by which the woman agrees to waive and relinquish all right, title or interest in and to any part of the estate personal and real, or the proceeds of the sale of either or both, of which the man is or may become possessed or acquire—and further agrees and finds herself never to claim or demand at law or otherwise, as she would be entitled to demand by reason of the solemnization of marriage with him, any part of his property—and further agrees that she shall never in the future acquire any property, rights, interest or title in or to any part of his estate further than he may convey to her by deed of gift or by will—and further agrees that he shall at all times during his lifetime have the right to sell or convey any part or all of his real estate and make a deed and convey a perfect title to the same without her consent or her signature and acknowledgment as his wife to the deed—does not either expressly or by necessary implication cut off and bar her right of dower, should she survive him. *Beard* v. *Beard*, 22 W. Va. 130.

2. CONTRACT—ANTENUPTIAL CONTRACT—DOWER.

Our Code having provided that "if any estate, real or personal, intended to be in lieu of her dower, shall be conveyed or devised for the jointure of the wife, such conveyance or devise shall bar her dower of the real estate or the residue thereof; but if such conveyance or devise was before the marriage, without the assent or during the infancy of the *feme*, or if it was after marriage, in either case, the widow may, at her election, waive such jointure, and demand her dower;" it seems that an antenuptial contract made by an illiterate woman, who can not write her name, with a man of substance, to whom she is engaged, whereby, without any provision for her, by way of jointure or otherwise, and without any reciprocal engagement by the prospective husband, she

should agree to relinquish all right as dowress or distributee in his estate, will not be enforced in a court of equity as a bar to dower; unless it is proved to have been read and explained to her, and to have been entered into without undue influence upon the part of the prospective husband. Should such contract make a fair, equitable, and reasonable provision for her, the case would be otherwise.

*A. F. Haymond* for appellant cited:

Stat. 32, Henry VIII, cap. 32; Freem. Co-Ten. and Par. §§ 420–423, 440, 441, 446, 447; 66 N. Y. 37; 63 How. Pr. 408; 28 Vt. 230; 13 Vt. 320; 2 Barb. Ch'y 398; 19 Wend. 367; 13 N. J. L. 271; 2 Root (Conn.) 278; 16 Pick. 191; 14 Mass. 434; 12 Pick. 374; 6 Watts 106; 8 N. H. 93; 2 Lilly Abr. 356 E.; 62 Ind. 441; 2 Ohio St. 208; 12 Gratt. 260, p't 3 syll., 284; 2 Gratt. 340; 8 W. Va. 29.

*G. A. Blakemore* for appellant cited:

Curry *v.* Curry 10 Hun; Sully *v.* Folger 14 Ohio; 27 Ohio St. 50; 2 Paige 511.

*E. A. Cunningham* for appellee cited:

1 Bish. Mar. Wom. Sec. 26; Id secs. 776–778; 8 Gratt. 486; 11 Gratt. 437; 22 W. Va. 130.

LUCAS, JUDGE:

This case comes up on an appeal from a decree of the Circuit Court of Pendleton county in a chancery cause, in which the appellant, Hannah Hinkle, was complainant. The object of her bill was to have her dower assigned her in the real estate of her deceased husband, who she alleges died intestate, seized of certain real estate, and left certain children as his heirs surviving him, who are named as defendants. The defendants for answer set up an antenuptial contract by which, it is claimed, the plaintiff before her marriage had relinquished upon the consideration of marriage all of her right, title, and interest in and to any part of the real or personal estate of her prospective husband. The contract is exhibited with the bill, but no evidence is offered to prove the circumstances under which it was executed. No depositions were taken upon either side, and the issue was made upon the construction and effect of the antenuptial agreement. The court below on the 17th of

April, 1888, entered a decree dismissing the bill on the ground that the complainant had relinquished or waived for a valuable consideration all her right to dower in the land, of which her deceased husband died seized. It is from this decree that an appeal has been allowed.

The preamble to the agreement is as follows: "This indenture, made this 30th day of June, in the year of our Lord one thousand eight hundred and seventy six, between Michael H. Hinkle, of the county of Pendleton, in the State of West Virginia, party of the first part, and Hannah H. Ketterman, of the same county and State, party of the second part: Whereas, marriage is intended to be solemnized between us, (Michael H. Hinkle and Hannah H. Ketterman) and, in consideration of such intended marriage, we (Michael H. Hinkle and Hannah H. Ketterman) do make and enter into the following agreements: The said Michael H. Hinkle being possessed of a tract of * * * acres of land, lying on the waters of the North Fork, on the east side of the river, joining the lands of S. P. Priest, P. Sponangle, and H. Bennett, as well as much personal property, said land being conveyed by Abram Hinkle and wife to Michael Hinkle by deed bearing date the ———— of ———— 187—, and of record in the clerk's office of the county court of Pendleton county. "

The first sentence then proceeds, (I have numbered the clauses for convenience of reference:) (1) "The said Hannah H. Ketterman hereby bargains and agrees with the said Michael H. Hinkle that she (the said Hannah H. Ketterman) hereby agrees to waive and relinquish forever all such right, title, or interest in and to any part of the estate, both personal and real, or the proceeds of the sales of either or both of which the said Michael H. Hinkle is now or may hereafter come in possession or acquire." It is impossible to say that this relinquishment does necessarily amount to a waiver of dower, which it is defined to be.

(2) "She (the said Hannah H. Ketterman) further agrees and binds herself never to claim or demand at law, or otherwise, as she (the said Hannah H. Ketterman) would acquire and be entitled to in the estate of the said Michael

H. Hinkle after intermarriage with him (the said Michael H. Hinkle) any part of his (the said Michael H. Hinkle's) estate or property, by reason of the solemnization of marriage between us, (the said Michael H. Hinkle and the said Hannah H. Ketterman.)" Here again the language does not necessarily import a waiver of dower, which is not, as our law now stands, a necessary acquisition "by reason of the solemnization of marriage ; " it depends upon the further fact of survival of the wife after the husband's death; a contingency which this clause dose not seem to contemplate or provide for. It is further agreed :

(3) "It is further agreed and expressly     *     *     *     by and between us (the said M. H. Hinkle and the said Hannah H. Ketterman) that she, (the said Hannah H. Ketterman) shall never in the future acquire any property, rights, interests, or titles in or to any part of the estate of the said Michael H. Hinkle further than he (the said Michael H. Hinkle) may convey to her (the said Hannah H. Ketterman) by deed of gift, or by will." This clause of the agreement binds the contracting female on the eve of marriage not to renounce any postnuptial settlement by way of jointure, (which under our Code, c. 65, § 5, she might otherwise do) and not to renounce her husband's will, (which otherwise she might do—Code, c. 78;) but I see nothing in it which renders it absolutely certain that she meant to renounce her dower in case she survived her husband.

(4) "It is further expressly agreed between us (the said Michael H. Hinkle and the said     *     *     *) that he (the said Michael H. Hinkle) shall, all times during his lifetime, have the right, independent of me, (the said Hannah H. Ketterman) to sell and convey any part or all his real estate, make a deed, and convey a perfect title to the same without my (the said Hannah H. Ketterman's) consent, or my name and acknowledgment, as his wife, to such deed of conveyance ; but his (the said Michael H. Hinkle's) deed shall in all respects be as perfect, and have the same effect, and convey the title as perfectly to any part of his real estate, as if no marriage existed between us, without my consent or acknowledgment, as his wife, with him to such deed."

It will not be pretended that this clause necessarily precludes dower, since it is expressly confined to the conveyances of the husband "during his lifetime." I see nothing, therefore, in the separate terms of this contract, which ought to be construed as clearly waiving and relinquishing the interest of the widow accruing not "by reason of the solemnization of the marriage" only, although that was a necessary condition, but by the further and immediate reason of her surviving him, and his dying intestate.

Neither can I reach a different conclusion when I consider all these clauses as constituting one whole contract. Construing all the contract together with all the light which any one clause may reflect upon the others, it is obvious to my mind that the intention to relinquish dower in the event of her husband's dying intestate, leaving the widow surviving, is neither expressly set forth nor necessarily to be implied. There is in the third clause evidence to show that the contingency of his dying first was thought of, and the only provision made for such contingency was that she should not renounce his will. If intended to cover a renunciation of dower also, it would have been the most natural and easiest thing in the world to have said so in express terms, and the omission to do this, or to use the word "dower" at all, in any part of a paper prepared evidently with elaborate and premeditated care, is satisfactory evidence to my mind that the woman, at least, never assented to the proposition that after relinquishing all claim upon her consort's property for support during their married life, and after having served him all that time gratuitously, and borne him children, she was at his death, in case he made no provision for her by deed or will, to forfeit all right of dower and distribution accruing by survivorship.

The case is almost exactly similar to that of *Beard* v. *Beard*, 22 W. Va. 130. In that case the antenuptial contract was as follows : "That in consideration of the fact that the said Abram M. Beard and Martha A. Clarke being desirous of entering into the bonds of matrimony, and each one wishing to keep his or her property, both real and personal, in his or her own name, and under separate control, and to be disposed of as he or she separately may desire, either by

sale or otherwise, the said Abram M. Beard and Martha A. Clarke agree that all the property, both real and personal, owned by them shall remain separate, and under his or her control, and each in his or her own name, the same as if they had never been married; and that none of the property of either one shall be subject to the debts of the other; and that they relinquish all claim, title, or interest in each other's property that might vest in them under the law by reason of expected marriage. Witness our hands and seals this 7th day of May, 1878. MARTHA A. CLARKE. [SEAL.] A. M. BEARD. [SEAL.]"

The last clause of this contract, "that they relinquish all claim, title, or interest in each other's property that might vest in them under the law by reason of their expected marriage," is quite as comprehensive, and in substance almost identical with the provisions 2 and 3 in the contract which we are now considering; yet the court held that the agreement did not bar the husband's right of survivorship, he having survived her. In delivering the opinion of the court, Judge GREEN said : "That he, by this marriage settlement, agreed that she should have a separate estate in all her property, and might dispose of it in any manner she pleased, is clear. But is there anything in the marriage settlement which shows clearly that he intended and agreed expressly, or by necessary implication, that he would surrender and release any interest he might have in her separate personal estate, as her administrator and sole distributee, if she should die childless, and without disposing of such separate personal estate ? It seems to me that there is not." I will not quote the reasons given for this conclusion, since they are entirely similar to the course of reasoning which I have pursued above, and fully accord with and confirm my own conclusion. 22 W. Va. 139–141.

Had the case been otherwise, had the contract used the word "dower," and, by express terms, or necessary implication, bound the wife to surrender and waive all right of dower and distribution in case she survived her husband, without any reciprocal surrender on his part, or any provision in the nature of jointure, or any other consideration

whatever beyond the agreement to marry, we should have been confronted with the question whether a court of equity in this State would enforce such a contract under the circumstances here presented, and deprive the widow of dower? Such a contract made by the man in contemplation of marriage would undoubtedly be enforced. See *Charles* v. *Charles*, 8 Gratt. 486. But as against the woman, there being no similar case as yet reported in Virginia or this State, I should be very unwilling to establish such a precedent. While the spirit of our statutes upon these subjects has been conformed in a marked degree to the advance of civilization and has enlarged the rights and control of women in and over their own property, persons, and contracts, it has nevertheless constantly kept in view the natural and Christian relations of the sexes, and recognized the position of the husband as the supporter and and protector of the wife and family, without whose consent her power to contract is limited; and who in all contracts between him and her is regarded as capable of exercising undue influence. Hence while her dower is confined to one third of his realty, his curtesy shall extend to the enjoyment of the whole of her estate of inheritance in lands. On the other hand, during the coverture, "if any estate, real or personal, be delivered by the wife to the husband in lieu of his curtesy, and he accepts the same, he shall be barred of his curtesy;" while the wife, should she enter into any such contract during coverture, "may, at her election, waive such jointure, and demand her dower." Code, c. 65, ss. 4, 5, 15, 16.

The spirit of our law, therefore, is to ignore any fanciful theories of identity and absolute reciprocity of powers, rights, and duties between the sexes, and to adhere to the natural and Christian order of human experience and divine government. Influenced by this genius of our legislation, I should conclude, therefore, that because the man may accept the marriage as a consideration sufficient to sustain his agreement to renounce and waive all right in his wife's property during coverture and of survivorship, should he out live her, nevertheless it by no means follows, that the weaker vessel, who has been induced to betroth

herself in marriage, can, without any other consideration whatever and in the absence of all reciprocal engagements on the part of the man and without any provision whatever for jointure bind herself by an antenuptial agreement not to claim any of the rights of survivorship in his property, should she survive him. I think such a contract would be adverse to the spirit, if not in direct contravention, of our statute. And such an opinion, were it necessary to decide the point, would be abundantly sustained by the highest authorities.

Upon this subject Mr. Bishop says: "The cases mentioned in the last section come as near as any to be found in the books, to an attempt to defeat dower by an antenuptial agreement wherein is made no specific provision for the wife, to be enjoyed by her during widowhood in lieu of dower. When some such provision has been made, the question has often come before the courts; and, whether under name of an equitable jointure, or under the name of a contract enforceable in equity, (or perhaps even enforceable at common law) the widow has generally, certainly by the better authorities, been held not to be entitled to dower. On the other hand there is no such adjudication as should be deemed to settle the question that equity, and even the common law, will not go further. If there ever should arise a case in which a man who had died in wealth had inveigled a girl to become his wife on condition that she should serve him during their married life, and on his death be turned out penniless upon the world, no court would experience any difficulty in its search for grounds on which to hold the unconscionable contract null as a bar to dower. But where the contract, made before marriage, is fair, reasonable, and just, and it has been fully executed by the husband and his representatives, on their side, the part on the widow's side which excludes her from dower should, on sound legal principles, be carried into effect like the rest, even though it does not create a fund for her sustenance in the nature of a jointure." 1 Bish. Mar. Wom. § 424.

Our Code provides: "If any estate, real or personal, intended to be in lieu of her dower, shall be conveyed or

devised for the jointure of the wife, such conveyance or devise shall bar her dower of the real estate, or the residue thereof. But if such conveyance or devise was before the marriage, without the assent or during the infancy of the *feme*, or if it was after marriage, in either case, the widow may, at her election, waive such jointure, and demand her dower." Code, c. 65, ss. 4, 5, p. 601.

Now, if the legislature thought special legislation necessary to bar dower, in a case, where the woman being of age had accepted by antenuptial agreement a provision in lieu thereof, it would be a fair inference, that, if the agreement made no such provision, then she would not be barred of dower. The true rule would seem to be that, in order to bar dower by an antenuptial agreement, some provision should be made in lieu thereof, and such provision should be a fair and reasonable one. On page 26, 27 Amer. Rep. there is a learned note by the reporter, who cites several cases, both English and American, to sustain the proposition of the main case, (*Pierce* v. *Pierce*,) that when the antenuptial contract is one-sided against the woman, the burden of proving its execution with full knowledge of its contents without imposition and with entire fairness is on the husband, and that such proof beyond the mere production of the agreement is required.

In *Page* v. *Horne*, 11 Beav. 227; (1848) a settlement in contemplation of marriage was made of the woman's own property on herself, and was revoked by her, without consultation, on the day before the marriage. The revocation was held invalid in the absence of proof of its entire fairness. The court said: "It is true that no influence is proved to have been used; but no one can say what may be the extent of the influence of a man over a woman whose consent to marriage he has obtained. Here, the husband having mortgaged the property, we are told by the report of the master that no undue influence had been used. The court, however, will look, with great vigilance at the circumstances and situation of the parties in such cases as the present, and will not only consider the influence which the intended husband, either by soothing or violence, may have used, but require satisfactory evidence that it has not been used."

In *Kline* v. *Kline*, 57 Pa. St. 130, (1868) the court below charged that "the woman was bound to exercise her judgment, and take advantage of the opportunity that existed to obtain information; if she did not do so, it was her own fault. The parties were dealing at arms-length. He was not bound to disclose to her the amount or value of his property." This was held error. The court says : "There is perhaps no relation of life, in which more unbounded confidence is reposed than in that existing between parties who are betrothed to each other. Especially does the woman place the most implicit trust in the truth and affection of him, in whose keeping she is about to deposit the happiness of her future life. From him she has no secrets. She believes he has none from her. To consider such persons as in the same category as buyers and sellers, and to say that they are dealing at arms-length, we think is a mistake. Surely when a man and woman are on the eve of marriage, and it is proposed between them, as in this instance, to enter into an autenuptial contract upon the subject of the enjoyment and disposition of their respective estates, it is the duty of each to be frank and unreserved in the disclosure of all circumstances naturally bearing upon the agreement. *It may perhaps be presumed in the first instance that such disclosure was made,* but any designed and material concealment ought to avoid the contract at the will of the party who has been injured." "The words italcised," says the reporter, "are *obiter*, and evidently in conflict with the well-settled doctrine, but the opinion was addressed only to the error of the charge, and expresses the doctrine so far as it was necessary to go."

In *Shea's Appeal*, Pa., 1888, (15 Atl. Rep. 629) it is said : "Wherever two persons stand in such a relation that, while it continues, confidence is necessarily imposed by one, and the influence which necessarily grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no such confidential relation had ex-

isted. Not only so, but there can be no contract between the two except after the fullest and fairest explanation and communication of every particular resting in the breast of the one who seeks to establish the contract with the person so trusting him." Bisp. Eq. § 232.

These principles apply to a variety of relations, such as those of guardian and ward, attorney and client, trustee and *cestui que trust*, principal and agent, and husband and wife. They also apply to the relation of persons betrothed; and the rule, that such persons owe to each other the greatest good faith, may be invoked to set aside secret antenuptial settlements in fraud of the marital rights of either, as well as antenuptial contracts between the parties where there is concealment of circumstances materially bearing on the contemplated agreement. *Kline* v. *Kline*, 57 Pa. St. 120; *Kline's Estate*, 64 Pa. St. 122; *Tiernan* v. *Binns*, 92 Pa. St. 248; *Bierer's Appeal*, Id. 265. We agree that such contracts are not to be regarded with disfavor. They come in conflict with no policy of the law, and are not to be viewed with the same degree of suspicion as voluntary donations. *Tiernan* v. *Binns, supra; Ludwig's Appeal,* 101 Pa. St. 535.

As a general rule, the scrutiny in cases of gifts is more severe and searching than in those of contracts (Bisp. Eq. § 231); and in contracts of this nature, as already suggested, it may perhaps be presumed in the first instance that full disclosures were made. But this is not the ordinary presumption in favor of the validity of contracts between persons dealing at arms-length; for as a general rule, where the relations of the parties are such as imply a condition of superiority held by one of the parties over the other, there in every transaction between them, by which the superior party obtains a possible benefit, equity raises a presumption against its validity and casts upon that party the burden of proving affirmatively its compliance with equitable requisites and of thereby overcoming the presumption. 2 Pom. Eq. Jur. §§ 956, 957; 1 Daniel, Ch. Pr. 850. Owing to the near connection between the parties, in many relations, the transaction in itself is considered so suspicious as to cast the burden of proof upon the

person, who seeks to support it, to show that he has taken no advantage of his influence or knowledge, and that the arrangement is fair and conscientious. In *Darlington's Appeal*, 86 Pa. St. 512, such is decided to be the case, where the provisions secured for the wife in an antenuptial contract is unreasonably disproportionate to the means of the intended husband. *Kline's Estate, supra; Bierer's Appeal, supra.* If, therefore, there is ever a *prima facie* presumption of his good faith, and of her full knowledge and independent consent and action, it seems to us that, in order to harmonize this class of cases with the general principles of law as to contracts between persons occupying fiduciary relations, the presumption must be regarded as one of fact, arising from the adequacy of the provision made for her, as compared with the intended husband's means, rather than one of law, arising from the execution of the instrument. At all events, the presumption, if there be one, in favor of the validity of the instrument may be overcome, and the burden of proof cast on the defendant by circumstances, which would be entirely inadequate to avoid an ordinary contract on the ground of actual and intended fraud.

In *Pierce* v. *Pierce*, 71 N. Y. 154, it is said: "Antenuptial agreements are severely scrutinized by the court, and, owing to the confidential relations between the parties, it seems that the presumption is against their validity, and the burden of proof is upon the husband to prove the perfect fairness of the transaction."

In Ohio, the statute on the subject of releasing dower by an antenuptial contract is identical in substance with our own, and is quoted in *Grogan* v. *Garrison,* 27 Ohio St. 59. In that case, by a treaty made by the parties prior to their marriage, the woman being of full age and under no restraint, agreed in consideration of the marriage to accept in full satisfaction of her dower the conveyance of one undivided third part of a certain lot for and during her natural life, this whole lot being described as less than one third of the husband's lands. The widow, who survived her husband, having petitioned for dower, this agreement was set up as a bar. But the court said that such an agreement was not a bar either at law or in equity. Not at law, be-

cause it is the release of a future demand not then in existence; citing as authorities for this position, *Hastings* v. *Dickinson*, 7 Mass. 155, and *Vance* v. *Vance*, 21 Me. 364. To the same effect, see *Faulkner* v. *Faulkner*, 3 Leigh, 255, and *Beard* v. *Beard, supra.* Neither was it a bar in equity, because it was not fair, reasonable and just as between the parties in view of all the circumstances of the case, at the time the contract was made. On the other hand, I have been unable to find a case in which a court of equity has enforced such an agreement as the one we are considering, although I find the law sometimes so stated in the syllabi. For example in *Forwood* v. *Forwood*, 5 S. W. Rep. 361, we have the following syllabus: "In the absence of fraud, a woman who is *sui juris* may, by antenuptial contract, relinquish her right of dower and distributive share in her intended husband's estate; and the marriage of the parties is a sufficient consideration to sustain such a contract." But the case itself does not support the syllabus. The covenants were mutual and reciprocal, as in *Findley* v. *Findley*, 11 Gratt. 434. The husband agreed that she was to retain her right to all the property that she then owned, or might thereafter acquire, was to have the benefit of her own labor, of contracting, and to be otherwise independent of her husband.

For the reason, therefore, that this contract was entered into, when the parties were engaged to be married, the woman was illiterate and unable to read or write; that no proof is offered that it was ever read to her or the contents explained; that its provisions are entirely one-sided, and neither fair, equitable nor just; and that they contravene the spirit of our statutes upon the subject of releasing dower—I would be of opinion that this contract, were it construed to have been intended to relinquish dower, could not operate in the absence of other proof, such as above indicated, as a bar to dower.

The decree of the Circuit Court is reversed and the case remanded with instructions to proceed in the manner indicated by the principles decided in this Court, and otherwise according to the principles and practice of courts of equity.

REVERSED.   REMANDED.