BESSIE G. WELSH

*v.*

ELLA WELSH, *et al.*

(No. 10354)

Submitted January 15, 1952. Decided February 19, 1952.

*Robinson & Stump, John S. Stump, Jr.,* and *Harvey W. Harmer,* for appellant.

*Deem & Marstiller, Fred B. Deem,* and *James A. Marstiller,* for appellee.

GIVEN, JUDGE:

This appeal involves the right of a widow to renounce the will of her deceased husband, pursuant to the provisions of Code, 42-3-1, and to receive in lieu of the property devised or bequeathed to her by the will dower in the real estate and a distributive share of the personal property of the estate of decedent. The only contention made against her right to renounce the will is grounded upon a marriage settlement contract entered into by the parties. George H. Welsh, in his own right, and as executor of the estate, appellant, contends that the marriage contract was executed prior to the marriage, that the marriage constituted a sufficient consideration therefor, and that a proper construction thereof precludes the right of the widow, appellee, to renounce the will. The lower court decreed that the contract "was, in fact and in law, a post-nuptial contract; and that said contract does not bar the plaintiff of her distributive and dower rights in and to the estate of said deceased husband", and directed the executor of the estate to "forthwith pay and distribute unto the plaintiff, Bessie G. Welsh, widow of Thomas F. Welsh; one-third (1/3) of the personal property now in his control and possession for distribution as such executor", and that the executor "do further pay unto said Bessie G. Welsh one-third (1/3) of all the personal property coming into his hands hereafter in and from the administration of said decedent's estate."

The testator, Thomas F. Welsh, died about May 6, 1944, at the age of eighty four years. He and the appellee, whose maiden name was Bessie G. Barrett, were married on March 27, 1932. The children of Thomas F. Welsh named in this proceeding, were of a former marriage, Thomas F. Welsh having been divorced from his first wife about ten years prior to the time of his marriage to Bessie G. Barrett. He then owned and managed a lumber business at Grafton, West Virginia, and Bessie G. Barrett had performed the duties of secretary for that business for approximately twenty years. They continued to operate the lumber business until the time of his retirement,

several years later. After his retirement she continued to assist him with the management of his property and business affairs. There is no evidence of any marital difficulty between Thomas F. Welsh and appellee, although, as seems not unusual in such cases, some of the children by his first marriage apparently resented his second marriage, but not to the extent of entertaining any permanent ill feeling toward the father. The evidence clearly shows that the wife was a faithful companion and attendant to Thomas F. Welsh during his declining years.

The marriage settlement contract, together with the certificate of the notary of the acknowledgment thereof, are set out in full:

"Grafton, W. Va., March 25, 1932.

"This Contract entered into this the above date between Thos. F. Welsh & Bessie G. Barrett parties to said contract and both of Grafton, W. Va. Witnesseth:

"That whereas said parties to this Contract have agreed to enter into the Bonds of Matrimony and thus become Man & Wife, this Contract is provided for the regulation of the private and personal business of each as well as their married lives.

"First: That each party to this contract is to have the right to their own personal Bank Account to be handled in their own name which shall not be in any manner interfered with by the other. Also that no business obligations of any consequence shall be entered into by either party without the written consent of the other party to this contract. Each to pay their own personal obligations.

"Second: The Lumber Business, in which Thos. F. Welsh has been engaged in, assisted by Bessie G. Barrett, is to be continued as heretofore with the following modifications; Bessie G. Barrett is to assist in this work as before with such help as her time from the home will permit. From the receipts of such business, Thos. F. Welsh is to pay all expenses of such business, all expenses of the incidentals of their home. After which a division, if

any, remaining receipts from such business is to be equally divided at the end of each year. But it is herein understood that Thos. F. Welsh shall operate his business in the same capacity as before marriage and the consummation of this contract. Receipts, if any, so checked to be final.

"Third: In consideration of the sum of Twelve Thousand Dollars received by Bessie G. Barrett from Thos. F. Welsh in her own personal use, and exclusive of Three Thousand Dollars so received which is now used and to be used in the purchased of and furnishing of their Home in Clarksburg, she agrees by this contract that Thos. F. Welsh to handle his business, deal and transfer property, both personal and Real in exactly the same manner and with same rights as before their marriage and the consummation of this contract, including the Residence in Clarksburg.

"Fourth: In the event of the Death of said Thos. F. Welsh before his wife, (Bessie G. Barrett) she is to have the undisturbed use of their home during her life or so long as she remains his widow, after which time it is to revert to the estate of said Thos. F. Welsh.

"Fifth: The conditions of this contract are made for the regulations of the business in the lives of both parties during their lives or the life of eaither in their relations as Husband and Wife, Therefore nothing herein shall be construed to modify or alter in any manner the Wills or Testament of either party to this contract.

"/s/ THOS. F. WELSH.

"/s/ BESSIE G. BARRETT WELSH

Nov. 12, 1932

"Clarksburg, W. Va.

"Harrison County, to-wit:

"This day appeared before me in my said county, Thos.

F. Welsh, and Bessie G. Welsh, his wife, who acknowledges the above signatures to be their own.

ROBT. McCLUNG,
Notary Public."

"My commission expires Sept. 24, 1935."

It will be observed that the contract was dated two days before the marriage of Thomas F. Welsh to Bessie G. Barrett, and that certain recitals therein indicate strongly that it was prepared prior to the marriage. It will also be observed, however, that appellee signed the contract in her married name, that the certificate of acknowledgment bears date November 12, 1932, months subsequent to the marriage, that appellee acknowledged the contract in her married name, and that the notary certified appellee to have been the wife of Thomas F. Welsh. From these facts we believe the circuit court correctly found that the contract was executed and delivered after the marriage. In reaching this conclusion we are not unmindful of the rebuttable presumption that the instrument is presumed to have been executed and delivered as of its date. See *Hawley* v. *Levy,* 99 W. Va. 335, 128 S. E. 735. Neither have we failed to consider the fact that the acknowledgment of the instrument here involved was unnecessary to its validity. We think the question of whether the marriage settlement contract is to be considered as being antenuptial or postnuptial can be of little significance, however, in view of our construction of the contract. We are of the opinion that the provisions of the contract do not preclude the widow from renouncing the will.

It is well established in West Virginia that marital rights of one spouse in the property of the other may be released or barred by agreement: *Coatney* v. *Hopkins,* 14 W. Va. 338; *Beard* v. *Beard,* 22 W. Va. 130; *Hinkle* v. *Hinkle,* 34 W. Va. 142, 11 S. E. 993; *Beverlin* v. *Casto,* 62 W. Va. 158, 57 S. E. 411; *Bramer* v. *Bramer,* 84 W. Va. 168, 99 S. E. 329. But to bar such rights the intent to do so must be "clearly manifested by the plain words of the

instrument or by necessary implication therefrom." Part Point 3, syllabus, *Bramer* v. *Bramer, supra; Beard* v. *Beard, supra; Hinkle* v. *Hinkle, supra; Coatney* v. *Hopkins, supra;* 6 M. J., Dower, Section 51. The rule applies to either antenuptial or postnuptial agreements. *Beard* v. *Beard, supra; Hinkle* v. *Hinkle, supra; Bramer* v. *Bramer,. supra; Chambers* v. *Pierce,* 94 W. Va. 766, 120 S. E. 912.

The right of dower existed at common law, and has always been a favorite of the law. In 28 C. J. S., Dower, Section 6, the author says:

"The object in allowing dower is to furnish means and sustenance for the wife and for the nurture and education of the younger children after the death of the husband and father, and looking to this object dower is held sacred and has been strongly fortified against invasion. It is a legal, an equitable, and a moral right, favored in a high degree by the law, and whether it is claimed by a suit at law or in equity the principle is the same. Courts are vigilant and astute in preserving dower, or kindred statutory rights, and will always award it in case of doubt.

"However, dower exists also for reasons of public policy, not dependent entirely on the maintenance and nurture of the widow and her children; it is recognized in this country as a positive and definite institution of the state. It is not the result of any contract between husband and wife, either express or implied, but is an institution of the state, founded upon public policy, and made by positive law an incident of the marriage relation.

"The right to dower attaches upon marriage, and accrues solely by reason thereof, but it does not become consummate until death of the husband. It is in addition to the share of her husband's estate to which she is entitled under the statute of descent."

To the same general effect are *Coatney* v. *Hopkins, supra; Fraser* v. *Stokes,* 112 Va. 335, 71 S. E. 545; *In re Carnevale's Will,* 285 N. Y. S. 591; *Realty Purchase Corporation* v. *Hall,* 216 N. C. 237, 4 S. E. 2d 514; *Taliaferro* v. *Alexander,* 80 Fed. 2d 172.

The marriage settlement contract under consideration does not disclose the clear intent required in such cases. Nowhere in the contract is the word "dower" or any word of like purport found. Of course, the use of any particular word would not necessarily establish the absence of an intent to release dower, but the absence of any mention of such right makes it necessary to examine closely for language disclosing an intent to bar dower. The first provision of the contract which may be considered as having any bearing upon the question is that the "Contract is provided for the regulation of the private and personal business of each as well as their married lives." The next provision having any bearing on the question merely states in more detail what was intended by the first provision, that is, the parties were to have "their own personal Bank Account", that "no business obligations of any consequence shall be entered into by either party without the written consent of the other", and that "Each to pay their own personal obligations." Clearly such provisions do not indicate any attempt to affect dower rights. As clearly stated in the contract, they merely provide "for the regulation of the private and personal business of each as well as their married lives." The next provision of the contract which may have any bearing upon the intention of the parties is found in the "Second" paragraph and relates only to the operation of the lumber business. It defines the duties of each in relation thereto and provides for a division of the net receipts therefrom. Here again we find no indication that the rights of either spouse in the property of the other were to be limited or affected except during their joint lives. The "Third" paragraph of the contract recites a consideration of $12,000.00 paid by Thomas F. Welsh to the wife, for her own "personal use", and shows clearly that it was not paid in lieu of dower but for the agreement on her part "that Thos. F. Welsh to handle his business, deal and transfer property, both personal and Real in exactly the same manner and with the same rights as before their marriage and the consummation of this contract, including the Resi-

dence in Clarksburg." We are not here concerned with any property which the husband did actually "deal and transfer". The "Fourth" paragraph of the contract merely provides that the wife, in certain circumstances, may "have the undisturbed use of their home during her life" if the husband predecease her. No language used in the paragraph tends to disclose any intention on the part of either that dower be released.

The first clause of the last paragraph of the contract merely confirms what we have previously attempted to point out, that the contract was entered into "for the regulations of the business in the lives of both parties during their lives or the life of either in their relations as *Husband and Wife, * * *"*, (emphasis supplied), and not after the death of one of the parties. The main reliance of appellant, however, in his contention that the contract precludes the widow from renouncing the will, is placed upon the last clause of the contract, reading: "Therefore nothing herein shall be construed to modify or alter in any manner the Wills or Testament of either party to this contract." To say the least, the meaning of this clause is ambiguous. Its language is not clear and certain, as is required in such a contract to bar dower. We find in the clause no expressed or necessarily implied intent to release or bar dower.

Moreover, nowhere is it disclosed that the wife received any consideration for release of dower. In 28 C. J. S., Dower, Section 56, it is pointed out that as to postnuptial marriage settlements "* * * the utmost fairness and good faith should be observed by the husband, and the consideration moving to the wife should be of such value as reasonably to compensate her for what she agreed to surrender; and such an agreement must be in writing and must be entirely free from doubt. * * *." The consideration of $12,000.00, recited in the paragraph numbered "Third", was for the expressed purpose of enabling Thomas F. Welsh "to handle his business, * * * in exactly the same manner and with the same rights as before their marriage * * *", and not in lieu of dower. See *Warner* v.

*Warner,* 235 Ill. 448, 85 N. E. 630; *Rice* v. *Winchell,* 285 Ill. 36, 120 N. E. 572; *Merchants National Bank* v. *Hubbard,* 222 Ala. 518, 133 So. 723, 74 A. L. R. 646; *Denison* v. *Dawes,* 121 Me. 402, 117 Atl. 314; *Kesner* v. *Trigg,* 98 U. S. 50, 25 L. ed. 83.

It being clear that the contract did not bar dower and that the widow timely exercised her statutory right of renouncing the will, the decree of the circuit court, in so far as it provides that the widow is entitled to dower and to her distributive share in the estate, must be affirmed.

It is contended that the decree allows the widow a greater proportion of the personal estate than is allowed her by the statute. The decree provides that the personal representative shall distribute unto the widow "one-third (1/3) of all the personal property coming into his hands * * *." Where a widow renounces a will and takes a distributive share of an estate, the amount of the distributive share to which she is entitled is governed by Code, 42-2-1. See *Cunningham* v. *Cunningham,* 30 W. Va. 599, 5 S. E. 139. That section provides that "When any person shall die intestate as to his personal estate or any part thereof, the surplus, after payment of funeral expenses, charges of administration and debts, shall * * *. (b) If the intestate leave a widow and issue by the same or a former marriage, the widow shall be entitled to one-third of such surplus * * *." It is apparent, therefore, that the widow in the instant case is entitled only to one-third of the personal property "after payment of funeral expenses, charges of administration and debts." In so far as the decree may be construed to provide otherwise, it must be reversed.

One other matter remains for disposition. The record discloses that Thomas F. Welsh, on November 8, 1941, executed unto Blair v. Welsh, a son, an assignment of certain personal property of the value of $32,519.15. This property was, at the time of the assignment, situated in the State of Maryland, in the possession of the assignee, who was then and still is a resident of Maryland. The

property consisted largely of indebtedness owing Thomas F. Welsh, secured by mortgages, and of United States Treasury bonds. It is not appraised as part of the estate of Thomas F. Welsh and is now claimed by Blair V. Welsh.

The widow now contends that the assignment was executed merely for the purpose of enabling the son to better transact business, in connection with the property, for the benefit of the father, and that the property belongs to and is a part of the estate of Thomas F. Welsh. Substantial evidence, which we need not weigh, was produced both in support of and against those contentions. Blair V. Welsh, the assignee and a resident of Maryland, was named a party defendant in this proceeding, but service of process upon him was had only by publication. He has made no appearance in the cause. George H. Welsh, the qualified executor under the will, professes to be of the belief that the assignment to Blair V. Welsh was valid and passed good title to the assignee, and has refused to attempt recovery of the property for the estate. The widow here contends that he should be compelled to do so. The circuit court found that the "* * * property was, in fact and in law, the property of Thomas F. Welsh, at the time of his decease and is now part of his estate * * *", and decreed "that the defendant, George H. Welsh, Executor of the Estate of Thomas F. Welsh, deceased, do proceed forthwith to have an administration of the estate of said decedent made and prosecuted to a completion in the State of Maryland and elsewhere where the same may be located; that he take whatever legal and court action is necessary for the discovery, collection, marshalling and recovery of the real and personal property of the decedent situate in the aforesaid State of Maryland and elsewhere, specifically including the aforesaid property, or the proceeds thereof, in the possession and control of Blair V. Welsh in Maryland and elsewhere; * * *".

It is the position of appellant that the circuit court was "utterly without jurisdiction" to pass upon the validity of the transfer of November 8, 1941. Appellee, in her brief filed herein, "recognizes that the Circuit Court of

Harrison County and the Domiciliary Executor have no extra jurisdictional powers or rights as to properties without their jurisdiction, * * *". She contends, however, that the domiciliary executor "may be required by decree to perform his duties with respect to his estate, even though the performance of those duties may take place without the State."

It is clear that a personal representative appointed under the laws of the state of the domicile of the decedent has no extra-territorial authority by virtue of such appointment. *Curl* v. *Ingram*, 121 W. Va. 763, 6 S. E. 2d 483; *Rybolt* v. *Jarrett*, 112 Fed. 2d 642; 21 Am. Jur., Executors and Administrators, Section 860. "Notwithstanding the well-recognized limitations on the authority of executors and administrators in reference to property belonging to the estate of the decedent located beyond the jurisdiction of the court in which the letters of administration have been granted, it is the duty of a domiciliary representative to gather in, and account for, foreign assets of his testator, to the extent of his ability to do so; and the court of the domicil may compel him to account for his wilful neglect to perform such duty. Any other rule would invite neglect and consequent waste and dissipation of assets. * * *." 21 Am. Jur., Executors and Administrators, Section 862. "One of the chief duties of an executor or administrator is to collect the assets and the debts due to the estate, even from heirs. This is included in the general duty to take charge of all the effects and personal assets *belong* to the decedent, and continues until the estate is finally closed. Prejudicial haste and dangerous delay are alike to be avoided. Mere nonresidence of the debtor does not of itself discharge an executor or administrator from the duty to use due diligence in collecting debts owing the estate." 21 Am. Jur., Executors and Administrators, Section 221. See *Shinn's Estate,* 166 Pa. 121, 30 A. 1026, 45 Am. St. Rep. 656; *Williams* v. *Williams,* 79 N. C. 417, 28 Am. Rep. 330. "It may even be the duty of an administrator in one state to take out letters of administration, or try to do so, in another state where a debtor

resides in order to bring an action against him. The necessity of taking this course of action depends on the circumstances of each case, the decision depending on the magnitude of the debt, the financial condition of the debtor, the distance, and the probable expense. * * *." Section 222, *Id.*

Schouler on Wills, Executors and Administrators, Vol. 2, Section 1175 (Fifth Ed.), has this to say: "Whether, then, the principal or domiciliary representative be required *pro forma* or not, to include in his inventory assets which come to his knowledge, either situate in the State or country of principal and domiciliary jurisdiction, or out of it, his liability, as to assets of the latter sort, depends somewhat upon his means of procuring them, and the fact of an ancillary administration in the *situs* of such assets. In any case he is bound to take reasonable means, under the circumstances, for collecting and realizing the assets out of his jurisdiction; nor is his liability a fixed, absolute one, but dependent upon his conduct; and it is getting the foreign assets into his active control that makes a domestic representative chargeable as for the property or its proceeds, rather than the duty of pursuing and recovering such assets."

Moreover, "The jurisdiction of the courts to supervise and direct executors and administrators has long been exercised, and may be invoked by a creditor. It is said that the extent and limits of the court's supervisory control are not clearly fixed, but depend on the circumstances. of the particular case.

"The court will not ordinarily usurp the representative's function of administering the estate to the best advantage of all concerned, and, except in cases of abuse, it will not ordinarily interfere with the discretionary powers conferred on the executor by the will.

"A court ordinarily has no power to limit the authority of the representative whose duties and powers are fixed by law; nor has it power ordinarily to violate the provi-

sions of a valid will, although it may relieve an executor from his duty to carry out the provisions of the will if the best interest of the estate is served thereby." 33 C. J. S., Executors and Administrators, Section 147.

Thus we find it is the clear duty of a domiciliary personal representative to exercise every reasonable means to recover possession of the entire estate of the decedent, wherever located. The duty does not necessarily end at the boundary lines of the state wherein he was appointed. If the circumstances of the particular case demand it, his duty is to seek the aid of the courts within the other state as to ancillary administration or as to any necessary litigation. The determination of the propriety of or necessity for any such action, in the first instance, necessarily rests within the discretion of the personal representative. In the event of any dissatisfaction as to any such action of the personal representative, any person in interest may bring the matter to the attention of the court having jurisdiction or supervision of the administration of the estate, or possibly the personal representative may seek direction and guidance from the court. See 33 C. J. S., Executors and Administrators, Section 147. In determining the propriety of any such action, either by the personal representative or the court, such matters as the value of the property involved, the probable cost to the estate and the probability of successful recovery, should be considered.

But to define the duties of the personal representative does not answer the question whether a court may compel him to personally go into a foreign jurisdiction for the purpose of conducting litigation therein. Of course, he can not continue to serve as such personal representative contrary to the direction of the court having jurisdiction of the administration of the estate. True, he would be liable in damages for any loss or injury resulting unto the estate because of any such refusal, or because of any unjustified action on his part in relation to the handling of the estate. But those interested in the estate should not be required to depend upon a personal recovery. They are entitled to have the estate properly administered.

Suggestion has been made in the instant cause to the effect that the widow has the same right as the personal representative to go into Maryland and cause to be instituted ancillary or other proceedings. That right may exist, but would it be conducive to orderly administration of the estate? Should she be required to perform labor in another state, and become personally liable for expenses, fees and costs, for the benefit of other persons entitled to participate in the distribution of the estate?

Appellant relies upon *State* v. *Fredlock,* 52 W. Va. 232, 43 S. E. 153, 94 Am. St. Rep. 932; *Woodcock* v. *Barrick,* 79 W. Va. 449, 91 S. E. 396; and *Morrison* v. *Morrison,* 174 Va. 58, 4 S. E. 2d 776. The holdings in those cases relate to the power of the court having jurisdiction *in personam* to require a defendant to do, or refrain from doing, beyond the jurisdiction of the court, anything that the court could require him to do within its territorial limits. We think the holdings have little, if any, weight here. No matters involving discretion of the parties against whom decrees or orders were entered, were involved in those proceedings. No title to property in another jurisdiction was in dispute, and what was required of the parties to be done, beyond the jurisdiction of the court, could and should have been done by them within that jurisdiction. Title to the property located in Maryland could not be determined by the courts in West Virginia, the claimant of the property not being personally served with process in the State of West Virginia.

In the instant cause the executor testified that from his investigation of the transfer made by Thomas F. Welsh to Blair V. Welsh, he was of the opinion that the transfer was valid and passed good title to Blair V. Welsh. Apparently all parties interested in the distribution of the personal property except the widow are satisfied with that finding of the personal representative. However, it seems clear that there was no consideration passed from Blair V. Welsh to his father in connection with the transaction and no reason appears why the father should have made

a gift of over thirty-two thousand dollars to Blair V. Welsh, more than twice the amount of the appraised value of the estate. In these circumstances, and in view of the circuit court's finding, it seems clear that the domiciliary executor should exercise his duty of having title to the property involved determined, in so far as he is able to do. In the event he fails or refuses to undertake this duty or otherwise neglects his duties, or fails to resign as such executor, he should be removed and another person appointed in his stead. See *Tramel v. Stafford,* 75 W. Va. 98, 83 S. E. 299.

As a general rule, a domiciliary personal representative of an estate should not be compelled by an order of court to administer an estate beyond the jurisdiction of the state wherein he was appointed. That the rule should be applied here seems clearly apparent in the circumstances of this case. To compel by order of court the executor in the instant cause to institute and prosecute litigation in the State of Maryland, against his brother, after having testified that he believed the transfer was valid, would not lead to orderly administration of the estate. We need not now attempt to point out the nature or necessity of any probable exception to the rule. That should await the particular case. It is recognized that the better and more orderly administration of an estate will usually be had if it is completed by the personal representative first having charge. In cases where the personal representative is nominated by a testator, his desire that a certain person administer his estate should control, if reasonably possible. However, such matters should not prevent the prompt removal of a personal representative who is incompetent, or who fails or refuses to perform his clear duties.

The decree of the Circuit Court of Harrison County, in so far as it provides that the marriage settlement contract did not preclude the right of the widow to renounce the will, and in so far as it provided that the widow is entitled to dower and to a distributive share of the personal property, is affirmed. In so far as the decree directs the

payment to the widow of a distributive share greater than "one-third of the surplus, after payment of funeral expenses, charges of administration and debts", in so far as it attempted to adjudicate title to property without the State of West Virginia, and in so far as the Court attempted to require George H. Welsh, executor, to take any action without the State of West Virginia, the decree is reversed.

*Affirmed in part; reversed in part; remanded.*