654 S.E.2d 588

Linda J. HAINES, M.D., Beneficiary of the Estate of Ralph W. Haines, Deceased, Petitioner Below, Appellant,

v.

Pamela K. KIMBLE, Executrix of the Estate of Ralph W. Haines, Deceased, Respondent Below, Appellee.

No. 32844.

Supreme Court of Appeals of West Virginia.

Submitted on Rehearing Oct. 25, 2006.

Decided June 28, 2007.

Michael E. Caryl, Esq., Martinsburg, WV, and Curtis G. Power, III, Esq., Winchester, VA, for Appellant.

Royce B. Saville, Esq., Romney, WV, for Appellee.

PER CURIAM.

The appellant herein and petitioner below, Linda J. Haines (hereinafter "Haines" or "appellant"), appeals from an order of the Circuit Court of Hampshire County (hereinafter "the circuit court"), wherein the circuit court on appeal affirmed an order of the County Commission of Hampshire County (hereinafter "the county commission") denying the petition of Haines to remove Pamela K. Kimble (hereinafter "Kimble" or "appellee") as the designated executrix of the estate of Ralph W. Haines, the deceased father of the appellant, the sole beneficiary of his estate. After a careful review of the record and briefs, and having listened to the arguments of the parties, we affirm the order of the circuit court.

I.

FACTS AND PROCEDURAL HISTORY

Ralph W. Haines, a life-long resident of Hampshire County, West Virginia, and an attorney in Romney for more than fifty years, died testate on May 3, 2002, leaving a last will and testament dated March 16, 1993 (hereinafter "will"), and an estate worth approximately $10 million. He devised and bequeathed his entire estate to the appellant, his only child; nominated and appointed Pamela K. Kimble, the appellee, as executrix of his will; and stated that he had given Kimble separate instructions regarding the handling of his estate.

The will was admitted to probate, and Kimble was appointed and qualified as executrix, on May 13, 2002. A few days later, Haines, through her attorney, wrote a letter to Kimble suggesting that she should not serve as executrix. On August 1, 2002, Haines filed with the county commission an objection to the appointment of Kimble as executrix and a petition for Kimble's removal and the appointment of herself as administratrix, with will annexed, to administer the estate of her father in the place and stead of Kimble (hereinafter "objection and petition").

In her objection and petition, Haines alleged that Kimble's hostility towards her, as well as mutual ill-will between them had jeopardized the efficient and effective administration of Mr. Haines' estate. Haines claimed that prior to her appointment and since, Kimble had actively supported and advanced the interests of other persons to the extreme prejudice of the estate; and that as a result of the actions of Kimble, her ability to faithfully execute her fiduciary's duties to the estate could be reasonably questioned. Kimble denied the allegations.

Because of perceived conflicts on the part of the fiduciary commissioners in Hampshire County, the county commission referred Haines' objection and petition to William H. Judy, III, a Hardy County attorney, to serve as special fiduciary commissioner to hear proof thereon, to make findings therefrom, and to advise the county commission on the law governing the decision of the matter. Judy conducted an evidentiary hearing on October 23, 2002. Six witnesses testified: Haines, Kimble and four witnesses on behalf of Kimble.

Kimble testified that she had had a very special relationship with Mr. Haines during the twenty-four years she served as his legal secretary: "Mr. Haines and I were boss and secretary, but we ... had a very close personal relationship. I felt towards him as a father figure. We bonded together ... when he needed something, he called me. I was the first one he called ... he called me no matter what time of the night if he had a problem or just wanted to talk ... he told me things, he said, that he never told anybody else ... He said I always made him feel better when he called me."

Acquaintances of the deceased testified that Mr. Haines relied upon, respected and trusted Kimble in their professional and personal relationships; that he often remarked that he didn't know what he would do without her; that she was efficient in assisting Mr. Haines in settling estates; and that Mr. Haines "knew exactly who he wanted to take care of his affairs" and that "he probably wanted to compensate [Kimble]" by naming her as the executrix of his estate.

As evidence of Mr. Haines' trust in Kimble, on August 23, 2000, he named her as his true and lawful attorney-in-fact and gave her broad powers to act on his behalf even though the appellant, his daughter, a physician, was then living in Romney. Mr. Haines in his will also expressed a desire that Kimble act as guardian of his grandson should his daughter predecease him.

Haines testified that she graduated from Hampshire County High School, with honors, that she had Phi Beta Kappa honors from Wellesley College, and that she received an M.D. degree from the University of Michigan. In 1993, when her father signed his will, she was living in Waltham, Massachusetts. In late 1999, she and her son, Benjamin, moved back to Romney to reside in the home of her father.

A significant part of Haines' testimony touched upon the relationship she had with her father (a relationship which Haines described as being "alienated") and the relationship which Haines had with Verna Kestner, a friend of her father's, between the time Haines returned to Romney in 1999 and the date of her father's death in 2002. At or about that time in 1999, her father ceased living in his home wherein Haines and her son had taken up residence. Mr. Haines represented to his daughter that he was staying at his apartment in the back of his office and that he preferred to stay there. Haines believed what her father had told her for a time until she later learned that he was probably living with someone else that he didn't let her know about. That someone else was later identified as Verna Kestner, a woman whom Haines described as her father's girl friend and a woman to whom Mr. Haines gave his medical power of attorney, despite the fact that his daughter, a medical doctor, was then living in Romney. Kimble testified that Mr. Haines was "afraid" and "petrified" that his daughter was going to put him into a nursing home.

Although not living with Haines and her son, Mr. Haines had frequent lunches and dinners with them, and often came to the house after work to play with his grandson. Over time, the lunches together became more intermittent and his visits after work at the home where Haines and her son were living became less frequent. Haines visited her father one morning in 2000 at Verna Kestner's house. She asked him if he could go out with her later in the day which he turned down saying that he was too weak to even walk across the room. When she returned to Verna Kestner's house later in the day, her father and Verna Kestner were just returning home to the Kestner house. Haines surmised that they must have been on a shopping trip, because there were shopping bags in the car.

On appeal, Haines focuses upon eight claimed instances of hostility between herself and Kimble. In support or proof thereof, she makes specific references to the October 23, 2002, hearing and exhibits placed in evidence at that time. Haines collectively describes the first four of the claimed instances of hostility as "the Appellee's pre-mortem hostility," and the last four as "Appellee's initial post-mortem hostility," with "pre" meaning prior to Mr. Haines' death on May 3, 2002, and "post" meaning after his death. Specifically, Haines cites the following instances of alleged hostility which she contends should disqualify Kimble as executrix of Mr. Haines' estate:

1. *Kimble's refusal to honor Haines' written request to be kept informed of significant adverse developments regarding her father's health.* This written request followed a second hospitalization of Mr. Haines in August 2000, of which Haines was not informed by either Kimble or Kestner. Haines testified that Kestner had told her that she wanted to call her about the hospitalization but that Kimble had said no. Mr. Haines had two separate hospital admissions in January 2001, of which Haines was in-

formed by Kestner. In April, 2002, Mr. Haines was hospitalized with a broken hip and Haines was informed thereof in a voice mail from an emergency room nurse.

Kimble testified that she was instructed by Mr. Haines not to call his daughter when he had his first hospitalization in August, 2000, and that he told her that he didn't want his daughter to know of his second hospitalization that month. Kimble related that "[i]f [Mr. Haines] would have told me he wanted Linda Jane [Haines] there, I would have called, but he was my boss, I had to answer to him and that's what I did."

2. *Kimble's persistent and open favoritism of the interests and feelings of Verna Kestner—the woman who Haines believed was, with Kimble's active assistance, manipulating her father to his great detriment.* Haines testified that Kimble wrote checks to Kestner and supported and encouraged her father's relationship with Kestner which damaged their father-daughter relationship. Haines has not claimed that the check writing was without the consent and knowledge of her father. Nor did Haines provide evidence to support her "belief" that Kimble actively assisted Kestner in manipulating her father to his great detriment.

3. *Kimble identifying herself as Mr. Haines' "next of kin" and her attempts to bar Haines from his hospital room against his wishes.* For the first of these two claims, Haines in her testimony referenced a face sheet from her father's hospital chart upon his admission to a Winchester, Virginia hospital whereon Kimble was listed as next of kin and, in parenthesis beside it, secretary. When asked "[w]ho would have provided this information," Haines responded, "I assume that Pam [Kimble] provided the information. I assume that Pam gave it." (Haines thus turned her assumption into a given—that Kimble had in fact so identified herself.)

Kimble was asked on cross examination whether Mr. Haines had given Kimble as his next of kin when admission personnel asked that question, to which she replied, "All he [Mr. Haines] told them was that I was his power of attorney and that I had his medical information. Whether they took the information, because I was power of attorney, and

stuck it in that blank, I don't know, because I've never tried to take Linda Jane's place you know. She is his daughter." When asked whether she had provided any of the information that admission personnel had used in filling in the face sheet, Kimble replied, "I probably did his [Mr. Haines'] birth date, because he sometime is a little vague on his birth date, his dates, but his insurance information was probably about the only thing I gave."

With respect to Mr. Haines' hospitalization in April, 2002, Kimble testified that Mr. Haines didn't want his daughter and grandson in his room because they made him nervous. She stated that Mr. Haines was afraid his daughter was going to put him in a nursing home and that he was afraid of such a prospect. Kimble conceded that when confronted by his daughter, Mr Haines denied having said he didn't want her in his hospital room. However, Kimble insisted that was what he had said originally. Kimble emphasized that Mr. Haines "was petrified of a nursing home."

4. *Kimble's failure to offer any support or comfort to Haines despite being in the hospital room with her as resuscitation efforts were being made in the moments immediately prior to Mr. Haines' death.* Haines testified that Kimble did not offer her a word of comfort either before or during the time her father was dying.

5. *Kimble's failure to attend the public viewings or memorial service for Mr. Haines and to extend any words of sympathy to Haines or her son regarding their loss.* While that was the testimony, Haines conceded that Kimble went to the funeral home with Kestner during the private memorial time. Kimble has represented to this Court that she believed that both she and Kestner had been restricted by Haines to a private viewing of the body.

6. *Kimble's written notice to Haines not to be present with her in the decedent's law office at the same time.* Based upon the cross-examination testimony of Kimble, Haines contends that Kimble conceded that Kimble wrote a letter to Haines, dated July 29, 2002, wherein Kimble stated: "I am

aware of what is going on and am sorry that you are uncomfortable with me. I have been advised by Royce [appellee's counsel] that it would be in the best interest of both of us that we are not in the office at the same time. I will be in the office from 9–12 each day until further notice."

Kimble conceded that the letter was her idea. She testified that she and Haines had initially gotten along appropriately after Mr. Haines died. Kimble testified that while she was later leaving on vacation, in approximately mid-July 2002, Haines convened a meeting of counsel, without notice to Kimble, to remove Kimble as executrix of the estate. Kimble stated that she was very upset about that because she thought she and Haines were getting along all right. Kimble felt that if Haines was uncomfortable with her being executrix, then Haines likely would not want to be around her in the office. Kimble added that she was upset by Haines' actions, because Haines didn't have a sense of trust toward Kimble. Kimble testified that shortly after the letter was written, she and Haines resumed regular communication and contact.

7. *Kimble's highly adversarial (and financially self-serving) challenge to Haines' claim of ownership of some or all or certain bearer bonds and other valuable items of personal property.* Haines contends that Kimble, on cross-examination, admitted to irregularities regarding certain bearer bonds in the estate. The principal of the bearer bonds amounted to $200,000, which Kimble related she had given to Haines shortly before her vacation in mid-July 2002. These bonds had been in the physical possession of the attorney for the estate for safekeeping from about two weeks after Mr. Haines had died until they were given to Haines. Kimble testified that later she requested Haines to return the bearer bonds to her so that they could be properly inventoried for appraisement, to which she received no response. In the testimony that Haines cites in support of this claim, there is no indication that Kimble had challenged Haines' claim of ownership of the bearer bonds. The circuit court in its order of November 19, 2004, found from the evidence that Kimble had never made a claim to the bearer bonds and

had provided them to Haines personally after having consulted with the attorney for the estate, all to the benefit of Haines.

8. *Kimble's antagonistic attempt to shift the burden of insuring certain other items of the estate's personal property to Haines as an individual.* Haines contends that Kimble gave her invoices for insurance on her father's automobiles with a note stating that these vehicles belong to you and that her (Kimble's) attorney had advised that the estate was not responsible for them. Kimble explained that she had consulted with the attorney for the estate about the insurance premiums, that he advised her that the estate was not responsible for them, and that she had followed his advice.

In an order entered on June 20, 2003, Special Fiduciary Commissioner Judy made a number of findings of fact and conclusions of law based upon the October 23, 2002, evidentiary hearing. Specifically, he found that Kimble, as the secretary of Ralph W. Haines for twenty-four years, had assisted him in the handling of many estates, and was, therefore, aware of the requirements of West Virginia law placed on an executrix; that at the time of the writing of his will in 1993, Mr. Haines believed that Kimble was the proper person to administer his estate because she had a thorough knowledge of his affairs and could be trusted to carry out his wishes; and that, in the nine years between the execution of his will and his death, Mr. Haines could have selected another person to be the executrix of his estate but had chosen not to do so. Judy concluded from the evidence that the hostility, if any, between Kimble and Haines had been induced by Haines and not by Kimble, and that Kimble was competent and had neither failed nor refused to perform her fiduciary duties as the executrix of Mr. Haines' estate.

On June 30, 2003, Haines filed exceptions to the Fiduciary Commissioner's order in its entirety. Therein, Haines also identified six "ill-motivated acts of Ms. Kimble's administration of the Estate that [she claimed] adversely affect its interests," which she stated had occurred "more recently." Following oral argument on Haines' exceptions, the county commission entered an order on July

17, 2003, which substantially adopted the findings and conclusions of its special fiduciary commissioner. After filing a motion for reconsideration and clarification with the county commission, which the county commission denied, Haines, on November 5, 2003, appealed the county commission's order to the circuit court.[1]

Following oral argument on Haines' appeal of the county commissioner's order, the circuit court affirmed the order of the county commission by order of November 19, 2004.[2] In so doing, the circuit court considered "the papers and pleadings filed herein and the testimony and evidence adduced before the Fiduciary Commissioner and the Hampshire County Commission together with all other memorandum in support thereof." Noting that "matters not substantiated by the evidence presented" had not been considered, the circuit court, in its order of November 19, 2004, proceeded to make its own findings of fact and conclusions of law from the record. Some of these findings mirrored the findings and conclusions of the special fiduciary commissioner and the county commission. The circuit court found that: (1) Kimble had been a secretary to, and personal confidant of, Mr. Haines for twenty-four years and had assisted him in the handling of many estates; (2) Kimble was well aware of the requirements of the estate settlement process and had carried out the provisions of Mr. Haines' will; (3) At the time of the writing of his will in 1993, Mr. Haines believed that Kimble was the proper person to administer his estate because she had intimate knowledge of his affairs and could be relied upon to carry out

his wishes, which belief did not change to the date of his death; (4) Haines developed an antipathy towards working with Kimble in settling the testator's estate; (5) Haines interfered with and refused to cooperate with the proper administration of her father's estate; and (6) Haines' actions had compounded the already difficult job of the executrix. In its conclusions of law, the circuit court concluded that: (1) The decision of Mr. Haines, a competent testator, in selecting the executrix of his estate should not be disturbed without a compelling reason; (2) Kimble had well-performed her duties in the complex administration of Mr. Haines' estate; (3) The hostility between the executrix and the beneficiary was a result of the actions of the beneficiary, Haines, and not based upon any action of the executrix, Kimble, adverse to the interest of the beneficiary; (4) Kimble had reasonably taken into consideration the requests and desires of Haines subject to her paramount duty to administer Mr. Haines' estate in accordance with the requirements of the Internal Revenue Service; and (5) Kimble should continue to administer Mr. Haines' estate.

Thereafter, Haines appealed the circuit court's order to this Court.[3] After having heard oral argument and considered the briefs of the parties, this Court issued a per curiam opinion on March 17, 2006, reversing the circuit court's order of November 19, 2004. On May 11, 2006, this Court granted Kimble's petition for rehearing. In our Order granting the petition for rehearing, the Court stated that "the mandate previously issued is hereby withdrawn," and ordered that the matter be re-briefed and re-argued.[4]

---

**1.** Judge Donald H. Cookman voluntarily disqualified himself from hearing the appeal and Judge John L. Henning of the Twentieth Judicial Circuit was appointed to replace him.

**2.** While the instant case was pending on appeal before the circuit court, Haines also filed a motion for preliminary relief, wherein she asked the circuit court to replace Kimble with herself as the authorized personal representative of the estate of her father. In this motion, she also sought to remove Special Fiduciary Commissioner Judy because she alleged he had acted in a dilatory and biased manner. Haines sought to replace him with a fiduciary commissioner who would report to the circuit court and not the county commission. An evidentiary hearing on Haines' motion was held before Judge Henning

on January 12, 2004. On January 22, 2004, Judge Henning entered an order denying Haines' motion.

**3.** While the appeal was pending, Haines filed a motion to supplement the record on appeal with certain documents which Haines conceded were not before the circuit court on her appeal from the county commission's order denying her petition to remove Kimble as executrix, but which she represented pertain to the on-going maladministration of her father's estate by Kimble. On November 3, 2005, this Court entered an order refusing Haines' motion to supplement.

**4.** Five days before Haines filed her brief on rehearing on June 21, 2006, Haines filed with the

Upon rehearing, we have considered the record, as well as the briefs and arguments of the parties.[5]

## II.

## STANDARD OF REVIEW

 As explained in Syllabus Point 4 of *Burgess v. Porterfield*, 196 W.Va. 178, 469 S.E.2d 114, (1996), "[t]his Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo.*"

## III.

## DISCUSSION

 The selection of an executor by a testator of an estate generally indicates that the testator did not intend to leave that choice for others to make. Thus, in honoring that intent, the appointment of an executor, or in this case, an executrix, should not be set aside lightly by this Court. "In cases where the personal representative is nominated by a testator, his desire that a certain person administer his estate should control, if reasonably possible." *Welsh v. Welsh,* 136 W.Va. 914, 928, 69 S.E.2d 34, 42 (1952). Similarly, as noted in William F. Fratcher, *Scott on Trusts,* § 107.1, p. 117.(4th ed. 1987): "The court is less ready to remove a trustee who was named by the settlor than it is to remove a trustee appointed by the court[.]" *See also,* Mark L. Ascher, *Scott and Ascher on Trusts* § 11.10.1 p. 667. (5th ed.2006) ("the court is typically less inclined to remove a trustee selected by the settlor."). The testator's selection of the fiduciary, however, "should not prevent the prompt removal of a personal representative who is incompetent, or who fails or refuses to perform his clear duties." *Welsh,* 136 W.Va. at 928, 69 S.E.2d at 42.

On appeal, Haines contends that the circuit court below erred in affirming the order of the county commission which had denied Haines' petition to remove Kimble as the designated executrix of her father's estate. Haines contends that alleged instances of mal-administration of the estate by Kimble and hostility by Kimble toward Haines, including alleged instances outside the record

Court a motion to appoint the Bank of Charles Town, as curator of the estate of Ralph W. Haines. This Court denied the motion.

5. In her brief on rehearing, Haines now lists twenty-plus claimed instances of violations by Kimble of her fiduciary duties as executrix of Mr. Haines' estate. The claimed fiduciary violations are divided and placed in four separate groupings with some of them collectively referred to by Haines as "Appellee's initial fiduciary violations"; some as "Appellee's 2003 offensive"; others as "Appellee's Tax Errors"; and still others as "Appellee's property sale threatening—false loan testifying—rights waiver coercing—secret reverse arbitrage subterfuge," or collectively and simply "the Appellee's loan subterfuge." With the exception of the claimed fiduciary violation relating to an assertion by Haines that Kimble had illegally altered and recorded a deed to what is referred to as the "McDonald property," almost none of the claims of mal-administration on the part of Kimble are a part of the record of the October 23, 2002, evidentiary hearing, upon which the special fiduciary commissioner, the county commission and the circuit court on appeal made, and were required to make, their respective findings of fact and conclusions of law.

While there was considerable testimony at the October 23, 2002, evidentiary hearing before Judy relating to Haines' claim that Kimble while serving as executrix breached her fiduciary duty by altering and recording a deed to the "McDonald property" (*e.g.,* when Haines was asked at the October 23, 2002, evidentiary hearing what improper things Kimble had done concerning the estate, she·cited only one thing: the recording of the deed of the McDonald property to Combs), Haines in her brief on rehearing does not reference that testimony but instead relies upon footnote 5 of her brief as providing support for and proof of the claim. Footnote 5 notes and describes a separate lawsuit instituted by Haines and the West Virginia Land Title Company (hereinafter "the Company"), the stock in which was owned by Mr. Haines' estate, against Kimble and Sharon R. Combs, wherein the plaintiffs asserted that Kimble had breached her fiduciary duty in having altered and recorded a deed to the McDonald property to Sharon Combs and sought damages against Kimble for the breach and for wasting the assets of the estate. In this separate action, by order entered on October 31, 2005, the circuit court granted summary judgment in favor of the defendant Kimble. Haines appealed the circuit court's summary judgment order in favor of Kimble in the McDonald property matter. This Court refused that appeal by order dated May 11, 2006.

considered by the circuit court below and outside the record before us on appeal, constituted a proper basis for Kimble's removal. We disagree and affirm the decision of the circuit court. In so doing, we pause to emphasize the deference which this Court should afford to a testator's personal selection of an executor or executrix of his or her personal estate.

 As observed by the Supreme Court of Pennsylvania in *In re Beichner's Estate*, 432 Pa. 150, 247 A.2d 779, 782 (1968), "[t]he removal of a personal representative chosen by the testator is a drastic action which should be undertaken only when the estate within the control of such personal representative is endangered. To justify the removal of a testamentary personal representative the proof of the cause for such removal must be clear." The court went on to state that "[a]nimosity Per se, absent any showing of any adverse effect on the estate or the rights of any beneficiary by reason of such animosity, does not constitute a ground for removal of an executor in whom the testator placed trust and confidence." *In re Beichner's Estate*, 247 A.2d at 782. Accordingly, where a testator has selected his personal representative (as Mr. Haines did in selecting Kimble as the executrix of his estate) it may be inferred that the testator had reasons for the selection and in such case (1) the testator's desire should control, if reasonably possible; (2) the personal representative selected by the testator should not be set aside lightly; and (3) a court should be less ready to remove a personal representative named by a testator than it to remove a personal representative selected and appointed by a county commission.

These principles are certainly applicable in this case for it has been shown that Mr. Haines had been assisted for over twenty years by Kimble, his secretary, in settling estates, that he knew that Kimble was knowledgeable in such matters and about his own business affairs, that he trusted Kimble to administer his estate in the manner he would

expect, and that he did not want his daughter, the appellant, in that role. Mr. Haines certainly had reasons for selecting Kimble as the executrix of his estate; accordingly, his desire should control, If reasonably possible, and his selection of Kimble should not be set aside lightly.

## A.

### The Circuit Court's Review of the County Commission's July 17, 2003 Order

The jurisdiction for probate matters,[6] such as the appointment and qualification of personal representatives, guardians, committees and curators, and the settlement of their accounts, has been vested by the Legislature in the county commissions or tribunals existing in lieu thereof or the officers of such county commissions or tribunals, not in circuit courts or their officers. *See generally,* W. Va.Code § 44–1–1 *et seq.* Thus, it is the county commission which may revoke and annul the powers of a fiduciary under whose order, or under the order of whose clerk, any such fiduciary derives his authority "whenever from any cause it appears proper . . . ." W. Va.Code § 44–5–5 (1982). Such a "fiduciary" includes the personal representative of an estate. W. Va.Code § 44–5–1 (1982).

The claims made against Kimble by Haines in her objection and petition seeking the revocation and annulment of Kimble's appointment as executrix of Mr. Haines' estate which could properly be considered below by the county commission in its order and by the circuit court on appeal from the county commission order are governed by West Virginia statutory law. In this case, the county commission referred Haines' objection and petition to a special fiduciary commissioner, Mr. Judy, to hear proof on the same, to make findings thereon, and to advise the commission on the law governing the decision of the matter, as is provided in West Virginia Code § 44–3–7 (1982). *See also* W.Va.Code § 44–3–3 (1982). Thereafter, the

---

6. "While the term 'probate' in some connections may be limited in meaning to the steps involved in the proving of a will, it more often is understood to include all the ordinary steps and incidents usual and necessary for the administration

of estates." *State ex rel., Charlotton v. O'Brien, Judge,* 135 W.Va. 263, 275, 63 S.E.2d 512, 518 (1951), quoting, *Ritchie v. Armentrout* 124 W.Va. 399, 20 S.E.2d 474 (1942).

county commission was limited to hearing "the case on the [fiduciary] commissioner's report and the exceptions thereto, without taking any additional evidence." W.Va.Code § 44–3–7 (1982). On Haines' appeal of the county commission's order, the circuit court was, in turn, limited to hearing, determining and deciding the appeal "upon the original record of the proceeding [before the county commission] as defined in [West Virginia Code § 58–3–4]." W.Va.Code 58–3–5 (1923). West Virginia Code § 58–3–4 (1923) specifies that:

> [the] original record shall be understood as including all papers filed in the proceeding, certified copies of all orders entered in the proceeding, copies of which are not in the files, and all matters included in bills of exceptions, or certificates in lieu thereof, as provided in section three of this article. The record may likewise include and the court may consider an agreed statement of facts, and, in case the testimony in the proceeding below was not stenographically reported and preserved, a certificate of facts made by such [county] commissioners, or a majority of them.[7]

In *Williamson v. Hays*, 25 W.Va. 609, (1885), this Court observed that:

> The mode of reviewing [cases appealed to a circuit court from a county court or, in this case, the county commission] is called in this statute [presently, W. Va.Code § 58–3–1] an appeal; but this is obviously a mere blunder, as will fully appear from section 14 of chapter 152 of Acts of 1882 [presently, W. Va.Code §§ 58–3–4 and 5], where the mode of conducting these ap-

peals is minutely prescribed; and it is obvious, that the circuit court is required to review the errors of law in such cases committed by the county court by writ of error erroneously called an appeal. For the case in the circuit court is to be heard only on a transcript of the record from the county court and not upon new evidence in the circuit court; and as the evidence in the county court in such cases is parol, it is evident, that this can not be a re-hearing of the case in the circuit court; and therefore it can not be an appeal, if any regard is paid to the meaning of the word appeal. *Williamson,* 25 W.Va. at 614. *Accord, Ferry Co. v. Russell,* 52 W.Va., 356, 359, 43 S.E. 107, 108 (1903) ("An appeal taken from the county [sic] to the circuit court under Code, c. 39, §§ 47, 48 [presently, W. Va.Code §§ 58–3–1 and 3], and chapter 112, § 14 [presently, W. Va.Code § 58–3–4], is not an appeal in the ordinary sense of the word, importing a process in the superior court by which a new trial of fact is had upon evidence the same as used in the county court or new evidence; but it is triable only on the record as made in the county court"); *In re Estate of Edwin A. Durham,* 119 W.Va. 1, 5, 191 S.E. 847, 849 (1937) ("there must be no uncertainty as to what constitutes the record upon which the matters to be reviewed were heard in the county court. Under our procedure an appellate court, in its consideration of reviewable questions, is confined strictly to the record made in the lower court. It must consider every part of it and no more. In order to accomplish the pur-

---

7. West Virginia Code 58–3–3 (1923) provides that a party to a county commission's proceeding intending to appeal an opinion of that commission to a circuit court may except to that opinion and tender a bill of exceptions to such opinion or a certificate in lieu thereof in the manner provided therein. In *Pettry v. Chesapeake and Ohio Railway Company,* 148 W.Va. 443, 451, 135 S.E.2d 729, 734 (1964), this Court stated that the "primary purpose [of such a bill of exceptions] is for use when a case is appealed in order to have the transcript of the proceedings and evidence made a part of the record for review by an appellate court." While Rule 80(f) of the West Virginia Rules of Civil Procedure has abolished bills and certificates of exceptions, the *Pettry* Court concluded that Rule 80(f) and the other Rules of Civil Procedure apply only when the

circuit court acts as a trial, rather than as an appellate, court on appeal from a lower tribunal. *Pettry,* 148 W.Va. at 452, 135 S.E.2d. at 734. Thus Rule 80(f) and the other Rules of Civil Procedure are not applicable when the circuit court sits as an appellate court and hears an appeal from a lower tribunal as in the case of an appeal from a court of record of limited jurisdiction such as appeals from final orders of county commissions regarding the appointment and qualification of administrators and executors. W. Va.Code § 58–3–1 (1993). Where the circuit court hears such an appeal from a county commission, its determination must be based "upon the original papers and certified copies of orders constituting the record of the case, as described in [West Virginia Code 58–3–4 (1923)]". W. Va. Code § 58–3–5 (1923).

poses of a review the appellate court must have before it the identical questions based upon the identical pleadings and proof that were before the lower court"); *In re Tax Assessment Against O.V. Stonestreet*, 147 W.Va. 719, 725-26, 131 S.E.2d 52, 56 (1963) ("It is manifest ... that when the party who seeks an appeal has appeared before the county court, as did the petitioners here, the appeal dealt with in Section 25 [W. Va.Code § 11-3-25] [Code, 1931] shall, if allowed, be determined from the evidence taken at the hearing before the county court as certified by that court, and that the petition for review shall be heard

and determined and the appeal shall be decided upon the original record of the proceeding as defined in Section 4 of the foregoing statute [W. Va.Code § 58-3-4, Code, 1931].") [8]

■ Therefore, based upon West Virginia Code §§ 58-3-4 and 5, and our decisions interpreting such statutory sections, we find that the circuit court below was required to hear, determine and decide Haines' appeal from the July 17, 2003, order of the county commission upon the original record of the proceedings before the county commission, as defined in W. Va.Code § 58-3-4, without

---

**8.** The distinction between an appeal and a writ of error or petition in error was noted as: "An appeal was unknown to the common law. In the civil law and equity jurisprudence its object was to take the whole case to the higher tribunal, there to be tried and determined *de novo*, upon the issues between the parties, as though the cause had originated in the appellate court ... [An] appeal has the effect to set aside and vacate the original verdict and judgment in the case; and the result remains wholly dependent on the future judgment which may be rendered in the case upon the appeal and new trial. By the second proceedings—review and error—the result depends entirely upon the question whether the appellate court finds the alleged error in the record of the judgment and proceedings of the court below." *Wingfield v. Neal*, 60 W.Va. 106, 111-112, 54 S.E. 47 (1906) (internal citations and quotations omitted).

The Legislature has in certain instances provided for *de novo* appeals to circuit courts from lower tribunals, as if the proceeding had originated in the circuit court, and in other instances has limited the circuit court in an "appeal" to determining and deciding the matter on the record made before the lower tribunal as is the case under the provisions of W. Va.Code § 58-3-5 (1923). Thus, for example, if exceptions are filed on a report of claims against an estate of a decedent returned by a fiduciary commissioner, the county commission considers the exceptions and make its order thereon without hearing or receiving any new evidence, and a circuit court on an "appeal" therefrom must try and determine the "appeal" on the record that was made before the fiduciary commissioner and on the order of the county commission. W. Va.Code § 44-2-19 (1982). On the other hand, an appeal of an order or judgment of the county commission admitting or refusing to admit any will to probate "shall be proceeded in, tried and determined in such [circuit] court, regardless of the proceedings before the county commission, and in the same manner and in all respects as if the application for such probate had been originally

made to the circuit court." W. Va.Code § 41-5-7 (1994). A careful consideration of statutory language is therefore critical to a determination of a circuit court's standard of review while sitting as an appellate court. For example, appeals to circuit courts from a county commission relating to the disposition of disputes arising from the provisions of W. Va.Code § 42-3-4 (1995), involving elective shares of husband or wife of decedent, are *de novo*. W. Va.Code 58-3-1 (1993). However, the review by a circuit court of a county commission decision denying a voter registration application is limited to the record before the county commission. W. Va.Code § 3-2-17(e) (1994). A county commission's assessment of land or personal property is reviewed by a circuit court from the evidence certified by the county commission if there was an appearance by or on behalf of the owner before the county commission, or if actual notice was given to the owner; if there was no such appearance or notice, "the matter shall be heard *de novo* by the circuit court." W. Va.Code § 11-3-25 (1967). A review by a circuit court of a family court decision is limited to a consideration of the record before the family court. W. Va.Code § 51-2A-14 (2005). A circuit court review of an administrative agency decision in a contested case is made upon the record made before the agency, except that in cases of alleged irregularities in procedure before the agency, not shown in the record, testimony thereon may be taken before the court. W. Va.Code § 29A-5-4 (1998). A circuit court review of a magistrate decision in civil and criminal cases is based upon the record before the magistrate if the case was tried before a jury, and is *de novo* by the court without a jury if the case was tried before the magistrate without a jury. W. Va.Code §§ 50-5-12 and 13 (1994). In *State ex rel. Collins v. Bedell*, 194 W.Va. 390, 460 S.E.2d 636 (1995), this Court held, as stated in Syllabus Point 3, that a defendants' due process rights as set forth in the state and federal constitutions "are not violated when a non-lawyer magistrate presides over the criminal trial, because *W. Va.Code* 50-5-13 [1994] provides meaningful review on appeal."

taking or considering any new evidence.[9] In keeping with this statutorily-created charge, the circuit court, in its order of November 19, 2004 affirming the county commission's order, properly noted that it had made it findings of fact and conclusions of law upon consideration of "the testimony and evidence adduced before the Fiduciary Commissioner and the Hampshire County Commission."

## B.

### Haines' Claims of Mal–Administration by the Executrix

 With two exceptions, Haines' current claims of mal-administration of her father's estate by Kimble were simply not presented in evidence at the October 23, 2002, evidentiary hearing before Special Fiduciary Commissioner Judy, were not in the evidence considered by the county commission, were not properly a part of the "original record" before the circuit court, and were not considered or acted upon by the circuit court in its appellate consideration. Accordingly, none of these new claims by Haines could have been properly considered by the circuit court under the provisions of West Virginia Code § 58–3–5 (1923), and cannot now be considered on our appellate review. They were not a part of the record which was properly considered by the circuit court. "This Court will not consider questions, nonjurisdictional in their nature, not acted upon by the circuit court as an intermediate appellate court." Syllabus point 1, *Pettry v. Chesapeake and Ohio Railway Company*, 148 W.Va. 443, 135 S.E.2d 729 (1964). Consequently, we turn to the two claims by Haines of mal-administration by Kimble which were properly raised below and which were a part of the record in this matter.

 The first claim of mal-administration relates to Haines' contention that Kimble illegally altered and recorded the McDonald property deed with Sharon Combs as the grantee. As noted previously, in a separate lawsuit commenced by Haines and the West Virginia Land Title Company against Kimble and Combs, the circuit court, in granting summary judgment in favor of Kimble, determined that Kimble had not breached her fiduciary duty to the estate in recording the deed with Combs as grantee because in doing so she had relied upon and followed the separate instructions given to her by Mr. Haines, her attorney employer.[10] Thereafter, this Court refused to hear Haines* appeal from that summary judgment order. Accordingly, this issue has been adjudicated in favor of Kimble and against Haines and cannot serve under a claim of mal-administration as a basis for the removal of Kimble as executrix.

 The second claim of mal-administration relates to Haines' claim that Kimble mishandled and planned the premature destruction of the clients' files of Mr. Haines. In support of this contention, Haines cites various pages of the transcript of the October 23, 2002, evidentiary hearing and two of her exhibits presented at that time. The circuit court did not make a specific finding in its November 19, 2004, order with respect to this claim. It did, however, conclude that "Kimble has well performed her duties in the complex administration of the Estate of Ralph W. Haines." With respect to this claim of mal-administration, based upon our review of the record, we cannot say that the circuit court's conclusion was clearly erroneous in view of Kimble's testimony that she had not mishandled or destroyed the testator's clients' files or indeed anything in Mr. Haines's law office other than her own address book.

Having reviewed the record and the circuit court's findings and conclusions, we find that the circuit court did not err in affirming the county commission's refusal to remove Kimble as executrix based upon Haines' claims of mal-administration. Haines failed to demonstrate any mal-administration sufficient to

---

**9.** In *Wilson v. Marion County Health Department*, 208 W.Va. 693, 695, 542 S.E.2d 856, 858 (2000), we observed that "as a general rule, matters subsequently communicated or brought to light or happening after the ruling objected to, and hence not considered by the lower court in connection with the ruling complained of, will not be considered on appeal." Quoting 5 C.J.S. Appeal and Error § 730.

**10.** *See* Footnote 5, *supra*.

remove Kimble as executrix and overcome the deference we afford to Mr. Haines' selection of his estate's personal representative.

## C.

### Haines' Claims of Hostility by the Executrix

■ Special Fiduciary Commissioner Judy, the county commission, and the circuit court independently reviewed the record of the evidentiary hearing before Judy conducted on October 23, 2002, and essentially made the same finding; namely, that the hostility, if any, between Kimble, the personal representative, and Haines, the beneficiary, resulted from the actions of Haines and were not based upon actions of Kimble adverse to the interest of Haines. Our own review of that record convinces us that these findings are not clearly erroneous. Indeed, the whole of the evidence relating to Haines' claimed pre- and post-mortem hostility by Kimble towards her fails to prove what Haines claims it proves.

■ We consider first Haines' claims of hostility by Kimble towards her prior to the death of Mr. Haines. Even if there was evidence that Kimble had shown hostility towards Haines prior to Kimble's qualification as executrix, such evidence cannot be relied upon to remove a personal representative of an estate for two reasons. First, as a general matter, even if hostility is recognized as a ground for the removal of a personal representative, that hostility must relate to the actions of the personal representative while serving in that role and not prior thereto. In this case, Kimble qualified as executrix on May 13, 2002. Eleven days later, Haines wrote a letter to Kimble suggesting that she not serve as executrix of her father's estate. This letter obviously was occasioned in large measure by Haines' perception of hostility on Kimble's part even before Mr. Haines' death. Second, and more specifically, we must consider Haines' claimed pre-mortem instances of hostility on Kimble's part in their proper perspective. While Mr.

Haines was living, Kimble's obligation was to heed the directions and wishes of her employer and close friend, Mr. Haines. Kimble was in the middle, so to speak, between Verna Kestner, with whom Mr. Haines was living and for whom he cared a great deal, and Haines, his daughter, who, understandably, had a less than cordial relationship with Kestner.[11] If Kimble, in her role of having to relate to Mr. Haines, Haines, and Kestner, appeared at times to favor Mr. Haines or Kestner, any such instances of perceived favoritism cannot simply be presumed to be hostility towards or a personal animus against Haines sufficient to overcome Mr. Haines' selection of her as his estate's executrix.

Kimble had a reasonable explanation for why she did not honor Haines' request to be kept informed of significant adverse developments regarding Haines' father's health. She was following Mr. Haines' instructions to her. Mr. Haines didn't want his daughter at the hospital; she made him nervous; and he was fearful that she was going to put him in a nursing home. Significantly, although his daughter was a medical doctor and was then living in Romney, Mr. Haines designated Kimble to be his attorney-in-fact with broad powers to act in his behalf, reserving to Verna Kestner, with whom he was then living, his medical power of attorney. At or about the time Haines returned to Romney and took up residence with her father, he moved out. Haines likewise failed to substantiate her "belief" that Kimble actively assisted Verna Kestner in manipulating her father to his great detriment.

With respect to Haines claims regarding Mr. Haines' hospitalization, Haines acknowledged that she had only assumed that Kimble had represented herself to be Mr. Haines' "next of kin" upon his being admitted to a hospital. Kimble categorically denied that she had so identified herself as Mr. Haines' "next of kin." In fact, Kimble said that Mr. Haines was fully competent at the time of the hospitalization and provided the requested information to the admission's

11. In oral argument before Judge Henning on October 4, 2004, Haines' counsel stated that Haines "loathed Verna Kestner."

nurse, with the possible exception of his birth date and insurance information. Again, Haines failed to demonstrate hostility by Kimble.

Finally, even if Haines's claims that Kimble did not support or comfort her in the moments before Mr. Haines' death are true, such claims do not, even if true, intrinsically prove hostility on the part of Kimble towards Haines. Any such failures on the part of Kimble may have resulted from any one or more other factors and it would be pure speculation to simply assume such subjective perceptions on the part of Haines to be true hostility by Kimble.

Turning to Haines' post-mortem claims of hostility, we similarly find no support for the removal of Kimble. It simply can not be said that by not attending the public viewings and memorial service of Mr. Haines or by failing to extend words of sympathy to Haines, Kimble demonstrated hostility towards Haines. Moreover, such perceived omissions occurred *before* Kimble qualified as executrix.

Likewise, we find no support for the removal of Kimble based upon the remaining three claimed instances of hostility that allegedly occurred after Kimble had qualified as executrix. With respect to Kimble's letter to Haines in late July, 2002 suggesting that she and Haines not be present in Mr. Haines' former law office at the same time, Kimble's explanation that her letter was prompted by Haines' efforts to remove Kimble as executrix does not constitute hostility against the estate. Kimble believed that if Haines was uncomfortable with her being executrix then she would probably be uncomfortable with the two of them being in the office at the same time. We likewise agree with the findings of Special Fiduciary Commissioner Judy and the county commission that Kimble consulted with counsel for the estate as to the proper disposition of the bearer bonds and followed his advice by including them in the estate to the benefit of Haines. Finally, as for Haines' third claimed instance of post-mortem hostility on the part of Kimble after

she had qualified as executrix, namely, that she had sought to shift to Haines the responsibility for the payment of insurance premiums on Mr. Haines' automobiles, Kimble offered a plausible explanation: she sought and followed the advice of counsel for the estate in doing so.

Overall, in view of the deference which a court should give to a testator's selection of a personal representative, and of our determination that Haines did not prove her claimed instances of hostility of Kimble towards her, either before or after she qualified as executrix, we conclude that the circuit court did not abuse its discretion in its final order of November 19, 2004, which affirmed the county commission's order of July 17, 2003, denying Haines' objection and petition, and directing that Kimble continue to administer Mr. Haines' estate.[12]

## IV.

## CONCLUSION

We find that the circuit court's findings of fact based upon the proper record before it were not clearly erroneous and that the circuit court did not err in its conclusions of law. With respect to the claimed instances of mal-administration cited by Haines and properly considered by the circuit court, we observe that the first claimed instance of mal-administration relating to Kimble's handling of the "McDonald property" was the subject of separate litigation which was resolved in Kimble's favor, not in Haines'. We have previously chosen not to disturb that ruling and will not do so now. With respect to the second claimed instance of mal-administration relating to the alleged premature destruction of certain office files, we conclude that the circuit court was not clearly erroneous in affirming the factual conclusions of the county commission and Special Fiduciary Commissioner Judy. With respect to Haines' claims of alleged hostility involving Kimble, we conclude that the circuit court was not clearly erroneous in finding that the hostility,

---

12. Accordingly, we need not decide whether and under what circumstances provable hostility on the part of a personal representative of an estate while serving in that role towards one or more

beneficiaries thereof may be grounds for removal of the personal representative, a decision which we will leave for another day.

if any, between Haines and Kimble was the result of actions by Haines, not Kimble. Indeed, we agree with the circuit court that the sum of the evidence fails to prove what Haines claims it proves. As such, in view of the deference which should be given to a testator's selection of a fiduciary, we find that Haines' hostility toward Kimble is an insufficient basis, without more, for removal of Kimble, Mr. Haines' designated executrix for his estate.

For the reasons set forth herein, we affirm the order of the Circuit Court of Hampshire County, West Virginia, entered on November 19, 2004, in its Civil Action No. 03–C–128, which affirmed on appeal the order of the County Commission of Hampshire County, West Virginia, entered on July 17, 2003, denying Linda J. Haines' Objection to Appointment of Executrix, Petition for Removal of Executrix and Appointment of Sole Beneficiary as Administratrix, filed on or about August 1, 2002, before the said county commission, and providing that Pamela Kimble shall continue to administer the Estate of Ralph W. Haines.

**AFFIRMED.**

Chief Justice DAVIS and Justice MAYNARD dissent and reserve the right to file dissenting opinions.

Justice STARCHER concurs and reserves the right to file a concurring opinion.

MAYNARD, Justice, dissenting.

This case is a lawyer's dream. Lawyers in this case have already collected more than one million dollars in fees with no end in sight, all due to Ms. Kimble's improper acts. Lawyers love Latin phrases and here is one that certainly should apply in this case. *Nemo ex suo delicto meliorem suam conditionem facere potest*, which is one of the ancient equitable maxims and is commonly stated as "no man should profit from his own wrong." (Literally it translates as no one can make his condition better by his own misdeed). In this case, the majority has ignored the maxim and has rewarded gross and serious misconduct by abruptly reversing our earlier opinion without satisfactory explanation. This entire episode is a colossal fiasco and demonstrates why our Court has been criticized. Therefore, I dissent.

This case was originally before this Court upon appeal of a final order of the Circuit Court of Hampshire County entered on November 19, 2004. On March 17, 2006, this Court filed a legally-sound and well-reasoned opinion reversing the circuit court's refusal to remove Ms. Kimble as the executrix of the estate of Mr. Haines. Given the urgency of the situation, we even issued the mandate contemporaneously with our opinion making it effective immediately. On May 11, 2006, nearly two months later and for some unknown and mysterious reason, three Justices of this Court voted to grant Ms. Kimble's petition for rehearing. Now, more than one year later, and more than two-and-one-half-years after the filing of the circuit court's final order, this Court has issued yet another opinion reversing our own March 17, 2006, decision.

There was simply no reason for this Court to abruptly change its collective mind, leaving this estate in limbo for years. Ms. Haines is the sole heir. She gets it all. There is no dispute about that. Now, after more than one million dollars has been wasted in legal fees, the majority is putting the estate right back in the hands of an individual whose actions have been, at best, highly questionable. It really is irrelevant in this case as to how these controversies and disputes arose or who may have been responsible for creating them because there are no joint fiduciaries or co-executrixes and there are no multiple or joint heirs. I cannot stress that point enough. There is only one executrix and one heir so there are no competing interests in the same classification. How in the world does an estate with only one single solitary heir incur lawyer's fees exceeding one million dollars and generate two conflicting Supreme Court opinions with different results? Only in West Virginia!!!

The issue below was whether Ms. Kimble should have been removed as executrix of the estate of Ralph W. Haines. Ms. Haines, Mr. Haines' daughter and sole beneficiary of his estate, presented strong evidence of continuous hostile relations between her and Ms. Kimble which had resulted in serious damage

to Mr. Haines' estate. In our initial decision, this Court was sympathetic to Ms. Haines' concerns. Somewhere along the line, however, even though no new evidence and no new legal or factual arguments were presented, and after our decision was released and final, the majority of this Court simply had a change of heart. It just does not make sense.

A review of some of the relevant facts is necessary. On May 3, 2002, the testator, Ralph W. Haines, died. At the time of his death, he had accumulated an estate believed to be worth more than ten million dollars. Pursuant to his will, dated March 16, 1993, which was admitted to probate before the County Commission of Hampshire County on May 13, 2002, Mr. Haines named Ms. Kimble as executrix of his estate. Ms. Kimble had been a secretary/legal assistant to Mr. Haines for several years prior to his death. According to his will, Ms. Haines, who is Mr. Haines' daughter and only child, was the sole beneficiary of his estate. On August 1, 2002, after several months of disagreements, Ms. Haines filed a petition for removal of Ms. Kimble as executrix of Mr. Haines' estate.

It is important to point out that at the time of the drafting of Mr. Haines' will in 1993, Ms. Haines was a permanent resident of Massachusetts. She had been a resident of Massachusetts for several years and had just purchased a home. It is more than reasonable to assume that Mr. Haines appointed Ms. Kimble executrix as a matter of convenience in light of Ms. Haines' residency at the time of the construction of his will.

In *Highland v. Empire National Bank of Clarksburg*, 114 W.Va. 498, 501, 172 S.E. 551, 554 (1933), this Court's holding established an unambiguous principle that, "[w]here inharmonious or unfriendly relations exist between the trustees, or between them and the *cestui que trust* [the beneficiaries], there may be sufficient reason for removal." (Citation omitted). *Highland* makes it clear that an executrix can be removed for something other than failure to perform her fiduciary duty. Moreover, a thorough reading of *Highland* shows that it stands for the proposition that carrying out the primary purposes of a testator's will must supercede keeping a particular fiduciary when the two objectives conflict. *Highland* provides that, "it is not essential how such relations originated, or whether the trustee, whose removal is sought, caused them by his own misconduct or not." *Id.* at 555 (citation omitted).

Additionally, in *Welsh v. Welsh*, 136 W.Va. 914, 928, 69 S.E.2d 34, 42 (1952), this Court held that the general mandate to give effect to the testator's intent "should not prevent the prompt removal of a personal representative who is incompetent or who fails or refuses to perform his clear duties." It should be clear to anyone reviewing the case at hand that the primary intent of Mr. Haines was to pass his entire estate to his daughter, Ms. Haines, while his secondary and subordinate intent was to name Ms. Kimble as executrix.

This Court's original March 17, 2006, opinion correctly decided this case in a fair, competent, and appropriate manner. As we said in that opinion,

> [W]hile there may be facts in dispute as to the specific reasons surrounding the hostile relations between the appellee and the appellant, there is no dispute that such hostile relations in fact do exist and that the parties cannot work together with any sense of civility or common purpose. We believe that such hostile relations, regardless of who is at fault, necessarily have already damaged, and in the future will continue to damage, the estate and the appellant's interest in it.

*Haines v. Kimble*, No. 32844, Majority op. at 591–592 (March 17, 2006).

With regard to the disharmony between Ms. Haines and Ms. Kimble, we pointed out that:

> This disharmony between the appellant and the appellee has brought to light numerous troubling allegations surrounding the administration of the testator's estate. For instance, the appellant maintains that the record is replete with examples of how the appellee's actions have hindered the proper administration of the estate. Specifically, she contends that the appellee made extensive corrections to the initial lists of the decedent's property to the detriment of the appellant and the estate and

that the appellee appropriated $200,000 of the testator's bearer bonds in alleged contemplation of his imminent death and concealed those bonds for several months prior to giving them to the appellant. With regard to those bonds, the appellant maintains that the appellee initially filed a federal estate tax return reporting that the appellant contributed funds for the acquisition of the bearer bonds, but later reversed herself and filed a "supplemental" federal estate tax return indicating that the testator died owning the bonds solely and the appellant had no pre-mortem interest in them. The appellant argued such action resulted in her owing significant additional federal taxes.

*Id.* at 6, 7. We also explained:

The appellant further declares that in spite of evidence that the testator had given her a collection of antique firearms in 1967, the appellee filed tax returns with the IRS reporting the guns as a part of the testator's estate. She also charges that the appellee persistently inflated appraisals on the testator's property to bolster her expected commission, that the estate unreasonably had to incur fees for the services of three different law firms at a cost of several hundred thousand dollars, and that the appellee unnecessarily obtained a wasteful loan purportedly to pay a portion of the federal estate taxes. Finally, the appellant states that the appellee mishandled the closing of the testator's law practice including the maintenance of his clients' files in a manner contrary to governing legal and ethical practices and that the appellee failed to maintain, secure, and insure the testator's property subject to the claims of creditors of his estate including his extensive real estate holdings.

*Id* at 7.

The result of the majority opinion is mind-boggling. Allegations swirled of inflated appraisals to increase Ms. Kimble's commission; improper appropriation of two hundred thousand dollars in Mr. Haines' bearer bonds by Ms. Kimble; unreasonable actions by Ms. Kimble causing Ms. Haines to incur hundreds of thousands of dollars in unnecessary federal and state taxes; more than one

million dollars in legal fees from three separate law firms; and mishandling of the closing of Mr. Haines' law practice by Ms. Kimble. As we clearly explained in our first opinion in this case, "regardless of the truth or veracity in the disputed items above and without determining blame or responsibility for the dispute, there are clear issues that simply cannot be ignored with regard to the administration of the testator's will." *Haines v. Kimble*, No. 32844, Majority op. at 593 (March 17, 2006).

The record strongly establishes the parties' hostile relations which have continued from the moment of Mr. Haines' death through his memorial service, funeral, and ever since. Ms Kimble even attempted to preclude any face-to-face interaction with Ms. Haines. In one letter to Ms. Haines, Ms. Kimble explained ". . . it would be to the best interest of both of us that we are not in the office at the same time. I will be in the office from 9–12 each day until further notice." During that time period, Ms Haines was trying to deal with the death of her father and with the finalization of his estate. Instead, she encountered continuous problems as even the most routine matters demanded the attention of legal counsel. Of course, this added to the already growing legal fees subtracted from Mr. Haines' estate.

We have consistently held that decisions involving the construction of a will always begin with the recognition that: "The paramount principle in construing or giving effect to a will is that the intention of the testator prevails, unless it is contrary to some positive rule of law or principle of public policy." Syllabus Point 1, *Farmers and Merchants Bank v. Farmers and Merchants Bank*, 158 W.Va. 1012, 216 S.E.2d 769 (1975); *see also* Syllabus Point 4, *Weiss v. Soto*, 142 W.Va. 783, 98 S.E.2d 727 (1957); *In re Conley*, 122 W.Va. 559, 561, 12 S.E.2d 49, 50 (1940). The majority has strayed far afield from this well-established principle.

In sum, there is no dispute that Mr. Haines clearly intended to leave all of his worldly possessions to Ms. Haines as his sole heir. Does anyone reading this seriously believe that Mr. Haines would have appoint-

ed Ms. Kimble if he had known there would be such aggressive and acrimonious battles between her and Ms. Haines in the administration of his estate? Likewise, it is inconceivable that had Mr. Haines envisioned the massive amounts of money being spent in legal fees alone, now estimated at more than one million dollars, that he would have appointed Ms. Kimble. The result of the majority opinion is not simply an injustice to Ms. Haines, it is also an outrage to Mr. Haines whose lifetime accumulation of assets is slowly being squandered dollar by dollar.

Therefore, for the reasons set forth above, I respectfully dissent. I am authorized to state that Chief Justice DAVIS joins me in this dissent.